IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, and J.P. MORGAN SECURITIES LLC | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 18-cv-03447 |
| v. | ) ) | |
| BERNARD S. BLACK, individually and as trustee, SAMUEL BLACK, individually and as trustee, ANTHONY DAIN, individually and as trustee, KATHERINE LITVAK, OLGA DAL, and JEANNETTE GOODWIN, as court appointed Conservator, and JOANNE BLACK, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS KATHERINE LITVAK AND OLGA DAL'S ANSWER TO ANTHONY DAIN AND JEANETTE GOODWIN'S CROSSCLAIMS AND COUNTERCLAIM TO COMPLAINT FOR INTERPLEADER AND DECLARATORY RELIEF**

Defendants Katherine Litvak and Olga Dal (collectively, "Defendants"), by and through their attorneys the Murphy Law Group, LLC, for their Answer to Defendants Anthony Dain and Jeanette Goodwin's Crossclaims and Counterclaim, state as follows:

**CROSSCLAIMS AND COUNTERCLAIM**

1.     Counter-plaintiff Jeannette Goodwin is the successor conservator for Joanne Black ("Conservator"), as appointed by the Denver Probate Court, Denver County, Colorado ("DPC"), In the matter of Joanne Black, Case No. D201PR001772 (Hon. Elizabeth D. Leith). Conservator is an individual citizen of Colorado.

**ANSWER:**     Defendants admit that Jeanette Goodwin ("Goodwin") was appointed successor conservator for Joanne Black ("Joanne") by the DPC in the proceeding entitled *In the matter of Joanne Black*, Case No. D201PR001772, pending before Judge Elizabeth D. Leith.

{00293635}

Defendants further admit that Goodwin is an individual and citizen of Colorado. Answering further, Defendants state that Goodwin is not a proper representative of Joanne in that Joanne has been a resident of New York for years and a New York court determined in 2016 that Joanne is not in need of a legal guardian.

2.      Counter-plaintiff Anthony Dain is Renata's nephew and Bernard's and Joanne's cousin. Anthony was an original trustee (co-trustee with Renata) of the Supplemental Needs Trust for the Benefit of Joanne Black under agreement dated December 19, 1997 ("SNT"), the Joanne Black 2013 Trust Agreement executed on March 22, 2013 ("2013 Trust"), and the Trust for the Benefit of the Issue of Renata Black ("Issue Trust"). (Collectively, the foregoing trusts are referred to herein as the "Trusts.")

**ANSWER:**      Admitted. Answering further, Defendants state that Dain resigned as a trustee of the Issue Trust and the 2013 Trust on December 2, 2015, and is currently a trustee only of the SNT.

3.      Joanne Black ("Joanne") is an individual citizen of the State of New York. Joanne is Bernard's sister, Samuel's aunt, and Litvak's sister-in-law.

**ANSWER:**      Admitted.

4.      Bernard Steven Black ("Bernard"), is an individual citizen of Illinois, residing in Cook County. Bernard is Joanne's sister, Renata's son, Litvak's husband, and Samuel's father.

**ANSWER:**      Admitted.

5.      Katherine Litvak Black, also known as Katherine Valerie Litwak, Katherine Valerie Litvak, and Yekaterina Valerie Litvak, ("Litvak") is an individual citizen of Illinois, residing in Cook County. Litvak is the current wife of Bernard and stepmother of Sam.

 **ANSWER:**      Admitted.

6.      Litvak and Bernard are both licensed (non-Illinois) attorneys and are professors at Northwestern University Pritzker School of Law ("Northwestern").

**ANSWER:**    Defendants admit that Litvak and Bernard are professors at Northwestern. Defendants further admit that Bernard is a licensed (non-Illinois) attorney, but deny that Litvak is a licensed attorney.

7.    The POD assets are held by JPMorgan Chase Bank, N.A. ("Chase Bank"), J.P. Morgan Securities LLC ("JPMS LLC"), and/or their affiliates (collectively, "Chase").

**ANSWER:**    Defendants admit that the POD assets were disclaimed and were distributed to the Trusts (or to beneficiaries which were treated as distributions to the Issue Trust), and that the Trusts have accounts at Chase. Defendant deny the remaining allegations of paragraph 7.

8.    Upon information and belief, Defendant, Olga Dal ("Dal") is an individual citizen of the State of Washington. Upon information and belief, Dal is Litvak's cousin.

**ANSWER:**    Admitted.

9.    Upon information and belief, Defendant, Samuel H. Black ("Sam") is an individual citizen of Maryland. Samuel is Bernard's son, Litvak's stepson, and Joanne's nephew.

**ANSWER:**    Admitted.

10.    Renata Black ("Renata") now deceased, was Bernard's and Joanne's mother, Samuel's grandmother, and Litvak's mother-in-law. Renata passed away on May 1, 2012.

**ANSWER:**    Admitted.

### The Trusts

11.    On December 19, 1997, Renata as Settlor established the SNT for Joanne's benefit.

**ANSWER:**    Admitted.

12.    Pursuant to the SNT, there were two Trustees of the SNT: Renata and Dain.

**ANSWER:**    Defendants admit that Renata and Dain were the initial trustees of the SNT.

13.    After Renata's death, Bernard became the successor trustee to Renata for the SNT.

**ANSWER:**     Admitted.

14.    Dain is and always has been a Trustee of the SNT.

**ANSWER:**     Admitted.

15.    During Joanne's lifetime, she is the sole beneficiary of the SNT.

**ANSWER:**     Denied.  Joanne is the primary, but not the sole, beneficiary of the SNT. At all times, the SNT has a remainder beneficiary, the Issue Trust, which as of today has at least eight individual beneficiaries.

16.    On December 19, 1997, Renata as Settlor established the Issue Trust for the benefit of the Bernard and his descendants.

**ANSWER:**     Admitted.

17.    Before her death, Renata established Roth IRA and other accounts at Vanguard and Fidelity, which accounts by the time of Renata's death had a combined value exceeding $3.5 million.

**ANSWER**:     Defendants admit that Renata established an account at Fidelity and a Roth IRA and other accounts at Vanguard, but deny that the combined value exceeded $3.5 million.

18.    Renata designated Joanne as the direct recipient of 95% of those accounts to be payable or transferable on death to Joanne (the "POD assets"), such assets valued at approximately $3.5 million in marketable securities.

**ANSWER:**     Denied.  Answering further, Defendants state that Vanguard asserted that change in beneficiary designations were made over the internet, without written confirmation, shortly before Renata's death, which made Joanne the direct beneficiary of 95% of the principal Vanguard accounts.  Defendants lack information sufficient to form a belief as to whether Renata implemented this change, or if so, whether she understood the consequences of the change in beneficiary designations.

19.     The POD assets are held by Chase Bank and JPMS LLC, and/or their affiliates (collectively, "Chase").

**ANSWER:**     Denied.   Answering further, Defendants state that the POD assets were disclaimed and were distributed to the Trusts (including distributions to beneficiaries that were treated as distributions to the Issue Trust) and that the Trusts have accounts at Chase.

20.     Following her death, Bernard initiated the probate process for Renata's estate by filing a petition in the Surrogate's Court of the State of New York, County of Westchester ("NY Probate Court"), Probate Proceeding, *Will of Renata Black*, Case No. 2012-1209. Pursuant to will Bernard submitted, Bernard was appointed Executor.

**ANSWER:**     Admitted.

21.     Because they were payable on death to Joanne, the POD assets were not part of Renata's Estate, but instead were the property of Joanne, individually, upon Renata's death.

**ANSWER:**     Paragraph 21 constitutes a legal conclusion to which no answer is required. Answering further, Defendants state that the POD assets became part of Renata's Estate upon the DPC approving the disclaimer.

22.     Pursuant to the terms of the will Bernard submitted to NY Probate Court, assets in Renata's estate would pass one-third to the Issue Trust for the benefit of Bernard and his descendants and two-thirds to the SNT for Joanne's benefit.

**ANSWER:**     Renata's will speaks for itself.  Defendants deny the allegations to the extent inconsistent therewith.

23.     Bernard knew the POD assets had transferred to Joanne directly upon Renata's death and belonged to Joanne.

**ANSWER:**     Denied.

24.     Bernard knew that, if he was able to obtain control of Joanne's POD assets, he would funnel Joanne's POD assets through Renata's estate of which he was the Executor and direct one- third of Joanne's POD assets into the Issue Trust for his and his children's benefit.

**ANSWER:**     Denied.

25.     On October 16, 2012, Bernard initiated a suit in Denver, Colorado, where Joanne then resided, petitioning for appointment as Joanne's conservator, *In re Application of Bernie Black*, Case No. 2012 PR 1772 ("Colorado Case").

**ANSWER:**     Admitted.

26.     Bernard represented to the DPC that he needed to safeguard Joanne's assets, including the $3.5 million POD assets which passed directly to Joanne, for Joanne's benefit.

**ANSWER:**     Bernard Black's Amended Petition for Appointment of Special Conservator for Adult petition speaks for itself. Defendants deny the allegations to the extent inconsistent therewith.

27.     In pursuit of his appointment as conservator, Bernard represented that Joanne was schizophrenic and homeless in Denver; that Joanne had directly inherited the POD assets from Renata; and the POD assets would pass outright to Joanne, and not into the SNT.

**ANSWER:**     Bernard Black's Amended Petition for Appointment of Special Conservator for Adult petition speaks for itself. Defendants deny the allegations to the extent inconsistent therewith.

28.     As part of his petition for appointment as conservator of Joanne's property Bernard stated to the DPC his intention to transfer all of Joanne's POD assets into the SNT for her benefit.

**ANSWER:**     Bernard Black's Petition speaks for itself. Defendants deny the allegations to the extent inconsistent therewith.

29.     Understanding that Bernard would disclaim on behalf of Joanne the entirety of the POD assets and that Bernard would move all of the POD assets into the SNT for Joanne's sole benefit, the DPC granted Bernard's petition and appointed him conservator.

**ANSWER:**     Denied. Bernard Black's Amended Petition for Appointment of Special Conservator for Adult petition and draft Order Appointing Special Conservator – Adult speak for themselves, and the draft order submitted to the DPC states on its face that the disclaimed assets

would be included in Renata's estate and further that two-thirds of that estate would be contributed to the SNT.

30.     In or about early 2013, while Bernard was continuing to portray himself as complying with his fiduciary duties and protecting his sister Joanne's best interests, Bernard prepared and requested Dain sign an amendment to the SNT adding Samuel as a "backup trustee" in the event of an urgency in the future where either Bernard or Dain was unavailable to act.

**ANSWER:**     Defendants admit that, in early 2013, Bernard requested that Dain sign, and Dain signed, an amendment to the SNT in which Samuel was added as an additional trustee to the SNT.  Answering further, Defendants state that Bernard was complying with his fiduciary duties in making that request of Dain, particularly given that Dain is an attorney and was capable of understanding what he was being asked to sign.  Defendants deny the remainder of the allegations of paragraph 30.

31.     In or about early 2013, upon obtaining control of Joanne's property from the DPC and contrary to his representations to the DPC, Bernard disclaimed Joanne's rights to the POD assets; transferred Joanne's POD assets to Renata's NY Probate Court estate; caused one-third of Joanne's POD assets (approximately $1.5 million) to be conveyed to the Issue Trust for himself and his descendants; placed just two-thirds of Joanne's POD assets into the SNT and 2013 Trust; and directed other assets belonging to Joanne into the SNT and 2013 Trust over which he exerted control.

**ANSWER:**     Defendants deny that Bernard did anything contrary to his representations to the DPC.  Defendants admit that Bernard, acting as Joanne's conservator, disclaimed Joanne's rights to the POD assets, as he was authorized to do by the DPC.  The remaining allegations are denied.

32.     In February 2013, as part of his scheme to steal from Joanne and control her assets, Bernard created the Joanne Black 2013 Trust Agreement (2013 Trust).

**ANSWER:**     Defendants admit that, acting as Joanne's conservator, Bernard, together with co-trustees Samuel Black and Anthony Dain, took actions to create the 2013 Trust, and that this trust was established in 2013.  Defendants deny the remaining allegations of paragraph 32.

33. Bernard and Samuel appointed themselves, together with Dain, as co-trustees.

**ANSWER:** Denied. Answering further, Defendants state that Bernard, Samuel, and Anthony Dain, all agreed to be trustees of the 2013 Trust. Defendants further stated that Bernard and Samuel had no power to appoint them.

34. Bernard convinced Dain it was beneficial to include Samuel as a third trustee "just for backup for the future," in the event Dain was traveling overseas for work or unavailable at a time when Joanne may have an immediate need for care.

**ANSWER:** Denied. Answering further, Defendants state that Bernard sent an email to Dain explaining why it could be useful to have Samuel as a trustee of the 2013 Trust. That email speaks for itself, and neither the trust agreement nor the email limits Samuel's powers as co-trustee, which Dain, as an attorney, understood, or should have understood.

35. Contrary to the representation to Dain, by establishing themselves as co-trustees, Bernard and Samuel sought to assure their ability to act as the majority without Dain's agreement or knowledge, in order to access and convert Joanne's assets to their own use.

**ANSWER:** Defendants lack information to admit or deny this claim and the count is therefore denied.

36. Among others of Joanne's assets, Bernard transferred into the 2013 Trust the Fidelity funds accounts Joanne obtained before Bernard persuaded the DPC to appoint him as Joanne's conservator.

**ANSWER:** Defendants admit that, acting as Joanne's conservator, Bernard contributed to the 2013 Trust, in addition to other assets, funds from Renata's account at Fidelity, which Fidelity had transferred into an account for Joanne Black. Defendants deny the remaining allegations of paragraph 36.

37. At a time when he was required by DPC order to place assets belonging to Joanne into the SNT for Joanne's benefit as beneficiary of the SNT and while he was trustee of the SNT, Bernard converted to his own use and benefit $1.5 million of the assets which should have gone to the SNT.

8

**ANSWER:**     Denied.

38.     Acting as a fiduciary relative to Joanne, Bernard disclaimed her $3.5 million POD inheritance from their mother; funneled Joanne's assets through accounts Bernard created in Renata's probate estate where he also owed fiduciary duties to Joanne; through this mechanism, converted one-third of Joanne's assets; and removed such assets to the Issue Trust for his and his children's benefit.

**ANSWER:**     Defendants admit that Bernard, in his capacity as conservator, disclaimed a POD designation for assets of Renata Black at Vanguard Group, which resulted in those assets flowing into Renata's estate, and being distributed in accordance with her will, and deny the remaining allegations of paragraph 38.

39.     Bernard created a new trust purportedly for Joanne's benefit, the 2013 Trust, appointing himself, Samuel, and Dain as co-trustees such that Bernard and Samuel could control the 2013 Trust.

**ANSWER:**     Defendants admit that Bernard, acting as Joanne's conservator, took steps to create the 2013 Trust, with Joanne as primary beneficiary, but deny the remaining allegations of paragraph 39. Answering further, Defendants state that Bernard, Samuel and Dain all agreed to be trustees of the 2013 Trust. Bernard had no power to appoint them.

40.     Bernard and Samuel used the 2013 Trust to manipulate funds to Joanne's detriment and to engage in transactions with Joanne's 2013 Trust to cause Joanne and the 2013 Trust to bear the brunt of the tax burdens incurred relating to Renata's probate estate, transferring the tax benefits to himself and his children.

**ANSWER:**     Denied.

41.     Bernard charged to Joanne the significant attorneys' fees and costs of creating the 2013 Trust.

**ANSWER:**     Defendants lack sufficient knowledge to admit or deny the count, and the count is therefore denied.

42.     Certain of Bernard's self-dealing was discovered and presented to the DPC, and on April 2, 2015, the DPC suspended Bernard's authority as conservator over Joanne's property.

**ANSWER:**     Defendants admit that the DPC suspended Bernard's authority as Joanne's conservator on April 2, 2015, but deny the remaining allegations of paragraph 42.

43.     The DPC held 4 days of evidentiary hearings and (1) concluded Bernard had stolen approximately $1.5 million from Joanne; (2) found Bernard had breached his fiduciary duties as Joanne's conservator; (3) entered a judgment against Bernard in favor of Joanne; (4) appointed a new conservator for Joanne; and (5) enjoined Bernard from using Joanne's funds to pay his attorney or other fees.

**ANSWER:**     Defendants admit that the DPC held four days of evidentiary hearings and state that its orders speak for themselves.

44.     Bernard and Samuel instituted multiple suits and repeatedly litigated against Joanne's interest.

**ANSWER:**     Denied.

45.     In their positions as trustees of the SNT and 2013 Trust, Bernard and Samuel, in combination with Litvak and Dal, used and attempted to use Joanne's assets held in SNT and 2013 Trust to pay the attorneys' fees incurred while litigating against Joanne's interests.

**ANSWER:**     Denied.

46.     Bernard, Samuel, Litvak, and Dal did not make any effort to mitigate the amounts incurred in the litigation relating to Joanne, the SNT, the 2013 Trust, or Joanne's other interests, but instead significantly increased the cost to Joanne

**ANSWER:**     Denied.

47.     Significant expenses were incurred at Joanne's expense during the litigation before the DPC as a result of Bernard's misconduct.

**ANSWER:**     Denied.

48.     The DPC found:

Mr. Black transferred funds into an excessive number of different accounts, which can only be likened to a shell game. It took an extraordinary effort by Ms. Kerr [the forensic accountant] to trace where funds were placed and the expenses paid by the funds... 25 different accounts were created to hold funds related to this case, encompassing Renata Black's original accounts at Vanguard and Fidelity and accounts opened by Mr. Black as Executor, Trustee and conservator. The Court finds 15 of these accounts appear to be completely unnecessary.

The Court finds Bernie Black has breached his fiduciary duties and has defended this action in bad faith for the reasons discussed above. The Court finds Bernie Black should personally bear the cost for these proceedings ...

All costs, fees and attorney fees incurred to prosecute this matter shall be paid by and chargeable to Bernie Black, including GAL fees and fees for Pamela Kerr's accounting and services. Any such fees and costs, including attorney fees paid by Joanne Black or her estate shall be reimbursed by Bernie Black with interest.

**ANSWER:**    The DPC's orders speak for themselves.  Answering further, Defendants state that there was no factual basis for the statements Judge Leith made in the first quoted paragraph.

49.    The DPC recommended Bernard not be appointed as a fiduciary for Joanne in any capacity – especially not in any capacity involving Joanne's assets.

**ANSWER:**    The DPC's orders speak for themselves.

50.    The DPC entered judgment for treble the amount Bernard had stolen, awarding a total in excess of $4.5 million in favor of Joanne and against Bernard, personally.

**ANSWER:**    The DPC's judgment speaks for itself.

51.    The DPC summarized its September 28, 2015 findings:

Bernie Black transferred funds from his deceased mother's accounts designated payable on death ("POD") to Joanne Black and his five eldest children to fund the Issue Trust ... Mr. Black perpetrated a scheme whereby he obtained an order from this Court to disclaim those POD funds and rather than place the funds into the SNT as he represented his intentions to be, he placed

two-thirds of the disclaimed funds into the SNT and one-third into the Issue Trust, all without fully disclosing his intentions to this court. Mr. Black therefore has no rights to any of the funds contained within the Issue Trust that were transferred or derived from Renata Black's POD accounts and the amount surcharged to him speaks to this.

**ANSWER:**     The DPC's order speaks for itself.

52.     With respect to Bernard and Litvak, the DPC also found:

Bernie Black and his current wife [Kate Litvak] both testified before this Court that they are law professors at Northwestern University in Chicago, Illinois. As such, each of these individuals has an enhanced duty for full and complete candor to the Court and to conduct themselves and this matter with dignity becoming judicial officers and professors. The taking of his sister's funds, the multiple suits initiated by Mr. Black against his family members, the inaccuracies in his pleadings before this Court and his apparent refusal to accept the changes his mother made to her estate plan are absolutely appalling and are not in keeping with his status as a law professor.

**ANSWER:**     The DPC's orders speak for themselves, and further state that the quoted language contains statements which have no factual basis. Defendants deny the existence of any heightened duty as a result of Litvak's being an attorney or an educator.

53.     In its September 28, 2015 Order, the DPC held:

This Court remains extremely concerned that its orders and intentions will be misrepresented by Bernie Black and Counsel appearing on his behalf to New York Courts as has apparently been done previously. This Court hopes that any questions which may arise as a result of this Order or any clarifications deemed necessary will be quickly brought to this Court's attention for resolution.

**ANSWER:**     The DPC's order speaks for itself.

54.     Dal conspired with Bernard to ensure her two children with Bernard obtained a share of Renata's assets.

**ANSWER:**     Denied.

55.     By March 2016, Bernard had used his fiduciary authority to spend at least $115,000 of Joanne's money to pay the lawyers he engaged to further his efforts to steal from Joanne and defend his actions in doing so.

**ANSWER:**     Denied.

56.     Bernard told the DPC, Joanne, and Dain that he had repaid Joanne the $115,000 using his own personal funds, which was false.

**ANSWER:**     Denied.

57.     In fact, Bernard caused the $115,000 spent on the lawyers he used to defend his theft from Joanne before the DPC to be deducted from assets belonging to Joanne.

**ANSWER:**     Denied.

58.     When Bernard's misconduct was discovered, Bernard told the DPC he had taken funds belonging to Joanne from the 2013 Trust and SNT (via Renata's probate estate) to pay the $115,000 to his lawyers.

**ANSWER:**     Denied.

59.     On March 17, 2016, the DPC entered its final order following its September 28, 2015 Hearing Order rendering its final judgment for Joanne against Bernard for over $4.5 million (the "Colorado Judgment").

**ANSWER:**     The DPC's order speaks for itself.

60.     The March 17, 2016 order was subsequently upheld by the Colorado Court of Appeals on January 25, 2018. *In re the Interest of Black*, 2018 COA 07 (Col. Ct. of App.).

**ANSWER:**     The Colorado Court of Appeals' decision on January 25, 2018 speaks for itself.

### November 2017 Colorado Injunction

61.     On November 3, 2017, the DPC ordered another injunction against Bernard, enjoining Bernard "from removing or moving any monies or other assets in which Joanne Black has any interest from their present locations"; ordering Bernard to "return all monies which were in the Supplemental Needs Trust on September 28, 2015"; and "specifically enjoin[ing Bernard] from transferring any funds he controls which were in the Supplemental Needs Trust on September 28, 2015, except to return them to the Supplemental Needs Trust."

**ANSWER:**     The DPC's order of November 3, 2017 speaks for itself.

62.     On November 3, 2017, the DPC found:

[A]n emergency exists because there is imminent risk of substantial harm to the financial interests of this estate ... based on the allegations that Bernie Black has removed funds from the 1997 Supplemental Needs Trust without Court authorization; funds that were removed from the conservatorship and placed into the Supplemental Needs Trust; ... appropriate action is necessary in the form of the following ORDERS pending hearing, as the actions described in this Motion and Bernie Black's prior actions as adduced after hearing and described in this Court's previous Findings and Orders all shock the conscience of the Court.

**ANSWER:**     The DPC's order speaks for itself.

63.     On January 4, 2018, the DPC held a hearing at which Bernard, through counsel, agreed to abide by the injunctions entered by the DPC on November 3, 2017.

**ANSWER:**     Denied. No hearing was held on this date by the DPC.

### January 2018 Colorado Injunction

64.     At the January 4, 2018 hearing, with respect to Bernard, Litvak, Dal, and Samuel, the DPC found their actions "reprehensible" and:

The Court finds the actions of Bernard Black are shocking to the conscience of the Court, especially given Mr. Black's position as a professor of law at a respected law school in this country. Similarly, the Court finds the actions of Mr. Black's wife, also a law professor, are shocking as together their actions only serve to dramatically increase attorney fees and costs and otherwise reduce or eliminate the funds that are due to Joanne Black apparently for no reason ...

The Court finds it is unable to adequately express how shocking these actions taken by Joanne Black's brother and his family are to the conscience of the Court. The Court finds Bernard Black's apparent agreement to the entry of significant money judgments in favor of his wife and her family against the SNT is, if true, a flagrant breach of his fiduciary duties and his duty of loyalty to the beneficiary. Bernard Black has disregarded the Orders of this Court in both fact and in spirit.

**ANSWER:** Denied. No hearing was held on this date by the DPC. The DPC's order of this date speaks for itself.

65. The DPC ordered another injunction against Bernard and an injunction against Sam:

> 1. Bernard Black and Samuel Black are hereby SUSPENDED as co- trustees of the SNT and any other trusts which benefit Joanne Black, pending the removal proceedings referenced in the State of Illinois.
>
> Neither Bernard Black nor Samuel Black shall have any authority or take any actions with respect to trust funds or funds that are ultimately meant for or to benefit Joanne Black. Similarly, neither Bernard Black nor Samuel Black shall make any decisions regarding the use or placement of trust funds or property. Both Bernard Black and Samuel Black are ordered to identify any and all trust documents, funds, or accounts to which they have access and which are meant to benefit Joanne Black, and to provide that information directly to Anthony Dain and to Joanne Black's attorney Lisa DiPonio.

**ANSWER:** The DPC's order speaks for itself. Answering further, Defendants state that the DPC improperly issued an order *sua sponte*, without a prior motion, notice, hearing, or evidentiary basis, which purports to take action against a non-party, Samuel.

66. By January 2016, Bernard was enjoined by two separate courts from accessing any of Joanne's assets, regardless of where her assets were located, including that Bernard was specifically enjoined from using those assets to pay attorneys' fees.

**ANSWER:** Denied**.**

67. Further, the DPC had specifically ordered Bernard, personally and solely, to repay the attorneys' fees he had caused to be paid by the SNT and other trusts or entities over which Bernard had control in a fiduciary capacity relating to Joanne.

**ANSWER:** The DPC's orders speak for themselves. Defendants deny the allegations of paragraph 67 to the extent inconsistent therewith.

68.     Chase was aware of the orders enjoining Bernard and litigation involving Bernard, Joanne, and the Trusts, and implemented measures to prevent release of Trust assets to Bernard.

**ANSWER:**     Defendants lack information sufficient to form a belief as to the matters of which Chase was aware, and why it took any actions it took with respect to Trust assets it is holding. Answering further, Defendants state that the orders speak for themselves. Defendants deny the allegations of paragraph 68 to the extent inconsistent therewith.

69.     In or about March 2016, pursuant to an order of the DPC, more than $250,000 was made available to agents and representatives at the time in an account Chase held on behalf of the SNT for the specific purpose of paying Joanne's legal expenses.

**ANSWER:**     The DPC's order speaks for itself. Defendants deny the allegations of paragraph 69 to the extent inconstant therewith. Defendants also deny that the amount of money alleged in paragraph 69 is accurate. Defendants lack information sufficient to form a belief as to the truth or falsity of the remaining allegations of paragraph 69 in that they are vague and indefinite as to time and the individuals allegedly involved.

70.     Bernard discovered the money was in Joanne's SNT account at Chase and transferred that money out of Joanne's SNT account for the benefit of him and Litvak.

**ANSWER:**     Denied.

71.     Bernard transferred approximately $9,000 of Joanne's money to one or more of the attorneys representing him in litigating against Joanne's interests.

**ANSWER:**     Denied.

72.     Bernard transferred the remainder of Joanne's money to pay down a home equity line of credit ("HELOC") held jointly by Bernard and Litvak.

**ANSWER:**     Denied.

73.     Litvak was aware of and intended for Bernard to make the foregoing transfers.

**ANSWER:**     Denied.

74.     Bernard, Samuel, Litvak, and Dal conspired to convert Joanne's assets to their own  use, and to prevent Joanne from collecting the Colorado Judgment against Bernard.

**ANSWER:**     Denied.

75.     In furtherance of their scheme, Bernard, Samuel, Litvak, and Dal conspired to and did  file at least eight (8) lawsuits against Joanne's interest and sought to have Joanne foot the bill via the  SNT and other vehicles.

**ANSWER:**     Denied.

76.     On January 29, 2016, Bernard and Samuel filed suit against Joanne in the Northern  District of Illinois, *Black v. Black*, Case No. 1:16-cv-01763 (Hon. Virginia M. Kendall) ("Black NDIL  Lawsuit").

**ANSWER:**     Defendants admit that Bernard and Samuel, in their capacities as trustees of the

Issue Trust, filed the referenced declaratory judgment action on behalf of the Issue Trust, with

Joanne as the nominal defendant, against whom no personal relief against Joanne was sought.

77.     In the Black NDIL Lawsuit, Bernard and Samuel sought a declaration from the  Northern District of Illinois that the orders imposed by the Colorado and New York courts did not  restrain them from using Joanne's assets to pay, among other things, their attorneys' fees.

**ANSWER:**     Denied.  The complaint in this action speaks for itself.

78.     Joanne had to hire attorneys to defend herself against Bernard's and Samuel's NDIL  lawsuit against her.

**ANSWER:**     The complaint in the Black NDIL lawsuit speaks for itself. Defendants lack

sufficient knowledge to admit or deny the allegations in paragraph 78, and it is therefore denied.

79.     On July 13, 2016, Judge Kendall dismissed with prejudice Bernard and Samuel's  NDIL Lawsuit against Joanne, because the Court did not have personal jurisdiction over Joanne.

**ANSWER:**     Admitted.

80.     Following the Colorado Judgment, Bernard, Samuel, Litvak, and Dal knew Joanne  would seek to collect her Colorado Judgment from Bernard.

**ANSWER:**     Denied.

81.     Bernard, Samuel, Litvak, and Dal concocted a scheme whereby they created alleged "loans" to Bernard, Samuel, the SNT, 2013 Trust, and Issue Trust; caused Bernard, Samuel, the SNT,  2013 Trust, and Issue Trust to default on every "loan;" filed complaints to collect on the "loans"; entered into agreed judgments against Bernard, the SNT, 2013 Trust, and Issue Trust; issued citations  against  Bernard, Chase Bank, and JPMS LLC to collect; and instituted  garnishments  of  Bernard's  wages to collect the money for their own benefit before Joanne could reach Bernard's wages to collect  her judgment for Bernard's theft.

**ANSWER:**     Denied.

82.     Although they knew Dain was a trustee of the SNT, none of Bernard, Samuel, Litvak,  and  Dal  notified Joanne, her conservator, or co-trustee Dain of any alleged "loan" between or among  Bernard, Samuel, Litvak, Dal, the SNT, 2013 Trust, or Issue Trust.

**ANSWER:**     Defendants admit that Bernard, Samuel, and Litvak knew that Dain was a trustee

of the SNT, but deny the remainder of the allegations in paragraph 82.

83.     None of Bernard, Samuel, Litvak, and Dal named Joanne, her conservator, or co- trustee Dain of any of their lawsuits based on alleged "loans" between or among Bernard, Samuel, Litvak, Dal, the SNT, 2013 Trust, or Issue Trust, nor even notified Joanne, her conservator, or co- trustee Dain of the lawsuits.

**ANSWER:**     The complaints in the lawsuits by Litvak and Dal, seeking to collect on loans to

the SNT, Issue Trust, and 2013 Trust, speak for themselves.  Defendants admit that Bernard,

Samuel, Litvak and Dal did not notify Joanne, Goodwin or Dain of the lawsuits.

84.     On May 5, 2016, to obstruct Joanne's ability to collect her judgment against Bernard, Dal filed a lawsuit against Bernard, personally, based on an alleged "loan" alleged to be secured by  Bernard's wages, *Dal v. Black,* Cook County Case No. 2016-L- 004367 (Hon. Patrick J. Sherlock),  ("Dal's First Lawsuit").

**ANSWER:**     Defendants admit that Dal filed the referenced lawsuit, but deny the remaining

allegations of paragraph 84.

85.     In Dal's First Lawsuit, filed in May 2016, Dal alleged that she and her father Eugene Mark Dal executed a "Secured Loan Agreement" purporting to be "Dated as of 15 May 2002."

**ANSWER:**     Dal's complaint in Dal's First Lawsuit speaks for itself.

86.     Dal alleged that pursuant to the "Secured Loan Agreement," she and her father were "willing to lend [$150,000 to Bernard], provided she receives a security interest in [Bernard's] income and financial assets."

**ANSWER:**     Dal's complaint in Dal's First Lawsuit speaks for itself.

87.     Dal does not allege when she and Bernard executed this alleged "Secured Loan Agreement."

**ANSWER:**     Dal's complaint in Dal's First Lawsuit speaks for itself, and includes as an Exhibit a secured loan agreement dated as of May 15, 2002.

88.     In Dal's First Lawsuit, Dal alleged: "As of April 30, 2016, there was principal of $150,000 and interest of $274,694.02 due and owing under the Note," for a total balance due from Bernard to Dal of $424,694.02, plus $91.33 per diem after April 30, 2016 – not including expenses, costs, charges and fees.

**ANSWER:**     Dal's complaint in Dal's First Lawsuit speaks for itself.

89.     On May 2, 2016, the same day Dal filed Dal's First Lawsuit, Bernard agreed to a judgment against himself in the amount of $425,150.68, including payment of Dal's legal fees and costs.

**ANSWER:**     Admitted.

90.     On May 3, 2016, Dal filed a Verified Emergency Motion for Entry of Agreed Judgment, in which she stated that other judgment creditors may initiate post-judgment proceedings against Bernard that may impair Dal's ability to collect the judgment Bernard had agreed to in favor of Dal.

**ANSWER:**     Dal's motion of May 3, 2016 speaks for itself.

91.     Neither Dal nor Bernard notified Joanne, her conservator, or Dain of Dal's First Lawsuit, Bernard's consent to a judgment in favor of Dal, or Dal's efforts to collect from Bernard.

**ANSWER:**     Admitted.

92.     Three days after filing Dal's First Lawsuit, Bernard had agreed to and the court had entered judgment in the amount of $425,150.68, issued a citation to discover assets, and filed an affidavit for wage deduction against Bernard on May 5, 2016.

**ANSWER:**     Denied.  Bernard did not file Dal's First Lawsuit, and the court did not issue a citation or file an affidavit.  The order of May 5, 2016 and the citation and wage deduction notice filed with the court by Dal on May 5, 2016 speak for themselves.

93.     By June 7, 2016, Dal had obtained a judgment against garnishee, Bernard, and his employer, Northwestern University.

**ANSWER:**     Defendants admit that, by June 7, 2016, Dal had obtained a judgment against Bernard.  Defendants further admit that, by June 7, 2016, Dal issued a garnishment summons on that judgment to Bernard's employer, Northwestern University.

94.     On September 23, 2016, to drain the Issue Trust of the money Bernard stole from Joanne, to pay their legal fees in litigating against Joanne's interests, and otherwise use the funds for their benefit, Bernard and Samuel initiated a claim with the Financial Industry Regulatory Authority ("FINRA") against Chase Bank and JPMS LLC to gain access to Joanne's assets in the *Issue Trust, Black v. JPMorgan Chase Bank*, *NA*., *et al.* ("Issue Trust FINRA Proceeding").

**ANSWER:**     Defendants lack sufficient knowledge to admit or deny the allegation of Bernard and Samuel's FINRA claim, and therefore it is denied.  The remainder of paragraph 94 is denied.

95.     In the Issue Trust FINRA Proceeding, Bernard and Samuel alleged Chase was liable for conversion, breach of contract, and breach of fiduciary duties owed to Bernard and Samuel because Chase would not permit them access to the money held in the Issue Trust and sought to force Chase to allow them unfettered access to the Issue Trust accounts.

**ANSWER:**     The arbitration Statement of Claim in the Issue Trust FINRA Proceeding speaks for itself.

96. In sum, Bernard and Samuel alleged that Chase could not consider the Colorado and New York orders enjoining Bernard from accessing the trusts' accounts or the Colorado judgment finding Bernard breached his conservatorship fiduciary duties to Joanne and stole $1.5 million from Joanne.

**ANSWER:** The Statement of Claim in the Issue Trust FINRA Proceeding speaks for itself.

97. Neither Bernard nor Samuel notified Joanne, her conservator, or Dain of their Issue Trust FINRA Proceeding or their efforts to access Joanne's assets.

**ANSWER:** Defendants lack sufficient knowledge to admit or deny the allegation, and paragraph 97 is therefore denied.

98. Bernard and Samuel actually complain in the Issue Trust FINRA Proceeding that Chase violated fiduciary duties because Chase notified co-trustee Dain of Bernard's and Samuel's efforts to obtain the money, which, per the Colorado court, belonged to Joanne.

**ANSWER:** Denied. Dain is not a co-trustee of the Issue Trust and the Issue Trust funds do not belong to Joanne. Answering further, the Statement of Claim in the Issue Trust FINRA Proceeding speaks for itself.

99. On October 26, 2016, to access to Joanne's funds to pay their legal fees in litigating against her interests, Bernard and Samuel, in their capacity as trustees of the SNT, filed another claim and initiated a proceeding with the FINRA against Chase Bank and JPMS LLC to gain access to Joanne's assets in the SNT to pay Bernard's attorneys' fees, *Black v. JPMorgan Chase Bank, NA.*, *et al.* ("SNT FINRA Proceeding").

**ANSWER:** Defendants admit that, on or about October 26, 2016, Bernard and Samuel, in their capacities as majority trustees of the SNT, initiated the SNT FINRA Proceeding. Defendants deny the remaining allegations of paragraph 99.

100. In Bernard's and Samuel's SNT FINRA Proceeding, they alleged Chase was liable for conversion, breach of contract, and breach of fiduciary duties owed to Bernard and Samuel because Chase would not give them access to use the money held in accounts of the SNT.

**ANSWER:** Denied. Answering further, The Statement of Claim in the SNT FINRA Proceeding speaks for itself.

101. In Bernard's and Samuel's SNT FINRA Proceeding, Bernard and Samuel seek to force Chase to unfreeze the SNT accounts to allow them access to Joanne assets to pay their attorneys' fees and otherwise for their own benefit.

**ANSWER:** Denied. Answering further, the SNT is an independent entity, its assets are not Joanne's assets; the core purpose of the SNT FINRA Proceeding was to obtain an order preventing Chase from allowing Dain to spend SNT funds, and the Statement of Claim in the SNT FINRA Proceeding speaks for itself.

102. In sum, Bernard and Samuel alleged that Chase could not consider the Colorado and New York orders enjoining Bernard from accessing the trusts' accounts or the Colorado judgment finding Bernard breached his conservatorship fiduciary duties to Joanne and stole $1.5 million from Joanne.

**ANSWER:** Denied. Answering further, The Statement of Claim in the SNT FINRA Proceeding speaks for itself.

103. Neither Bernard nor Samuel notified Joanne, her conservator, or Dain of their SNT FINRA Proceeding or their efforts to access Joanne's assets.

**ANSWER:** Denied. Answering further, the SNT is an independent entity, its assets are not Joanne's assets. Bernard and Samuel admit that they provided notice of the SNT FINRA Proceeding only to the respondents in that proceeding.

104. On December 7, 2016, Dal filed a second lawsuit against Bernard personally based on alleged "loans" alleged to be secured by Bernard's wages, *Dal v. Black*, Cook County Case No. 2016-L-011947 (Hon. Margaret Ann Brennan), ("Dal's Second Lawsuit").

**ANSWER:** Admitted.

105. In Dal's Second Lawsuit, Dal alleged that Bernard executed a "Promissory Note (Secured)" and a "Loan and Security Agreement" as of April 26, 2016, that is, after the Colorado Judgment against Bernard for stealing $1.5 million from Joanne.

**ANSWER:**     Admitted.

106.     Pursuant to the "Loan and Security Agreement," at the time Dal and Bernard dated "as of the 26th day of April, 2016," Bernard already was in default of another loan agreement with Dal "dated as of May 15, 2002" and owed Dal $453,891.03 on the earlier dated loan.

**ANSWER:**     Admitted.

107.     In addition, Bernard had purportedly borrowed over $600,000 from his wife and Dal's cousin, Litvak, "to pay legal and accounting expenses for litigation in Colorado, New York, and perhaps elsewhere related to [Bernard's] sister Joanne Black" pursuant to a "Senior Secured Credit Agreement" "Dated as of 20 August 2015" and executed on some unidentified date, which indebtedness was "senior to all other indebtedness of Bernard Black, other than any mortgage on [Litvak's and Bernard's] family house located at 2829 Sheridan Place, Evanston IL 60201."

**ANSWER:**     Admitted.

108.     Nonetheless, Dal allegedly loaned Bernard another $250,000 to pay Bernard's legal fees relating to litigation against Joanne's interests.

**ANSWER:**     Admitted.

109.     Among the provisions contained in the "Loan and Security Agreement":

a.     Bernard borrowed more money from Dal "to pay for certain of his needed expenses and/or obligations including, without limitation, legal and accounting expenses for litigation that relates to his sister, Joanne Black, and/or his other relatives, Anthony Dain and/or Cherie Wrigley."

b.     Bernard's debt to Dal was secured by, among other things, "all Commercial Tort Claims, including [litigation relating to Joanne and the Trusts]."

c.     Bernard told Dal of recent judgment entered against Bernard in the litigation relating to Joanne which constitutes a default under the loan agreement with Dal "dated as of May 15, 2002" and that he had "no unencumbered nonexempt assets to satisfy his obligations."

d.     Bernard agreed that he would consent to entry of and execute an agreed judgment in favor of Dal on the loan agreement with Dal "dated as of May 15, 2002."

e.     The events that could constitute a default on the "Loan and Security Agreement" excluded any then-existing events of default on the loan agreement with Dal "dated as of May 15, 2002."

**ANSWER:**     Admitted.

110.    In Dal's Second Lawsuit, Dal alleged: "there was principal of $210,483.60 and interest of $2,606.97, and at least $2,500 of legal fees and costs, due and owing under the Note," for a total balance due from Bernard to Dal of $215,590.57, plus $69.20 per diem after November 30, 2016 - not including expenses, costs, charges and fees she also sought to collect by garnishing Bernard's wages.

**ANSWER:**     Admitted.

111.    Dal further alleged Bernard was in default on this purported "loan" because a foreign judgment (the Colorado Judgment) entered against Bernard exceeding $4.3 million was registered in Cook County, Illinois on September 28, 2016.

**ANSWER:**     Admitted.

112.    On December 9, 2016, two days after Dal's Second Lawsuit was filed, Bernard agreed to a judgment against him in the amount of $216,905.37, and Dal filed a Motion for Entry of Agreed Judgment.

**ANSWER:**     Admitted.

113.    Neither Dal nor Bernard notified Joanne, her conservator, or Dain of Dal's Second Lawsuit, Bernard's agreement to a judgment in favor of Dal, or Dal's efforts to collect from Bernard.

**ANSWER:**     Admitted.

114.    Two weeks after filing Dal's Second Lawsuit, Bernard had agreed to and the court had entered judgment in the amount of $216,905.37, including payment of Dal's legal fees and costs.

**ANSWER:**     Admitted.

115.    By December 21, 2016, Dal had filed an affidavit for wage deduction summons directed to Northwestern University.

**ANSWER:**     Admitted.

116.     Dal received her Agreed Wage Deduction Turnover Order by January 26, 2017 garnishing Bernard's wages from Northwestern University.

**ANSWER:**     Defendants admit that a Wage Deduction Order was entered on January 26, 2017, but state that Bernard's wages are not currently being garnished under this order because they already are being garnished under a prior garnishment order entered in favor of Dal.

117.     On December 7, 2016, the same day Dal's Second Lawsuit was filed, and through the same counsel as Dal's, Litvak filed a lawsuit against her husband Bernard based on alleged "loans" alleged to be secured by Bernard's wages, *Litvak v. Black*, Cook County Case No. 20161-011948 (Hon. Raymond W. Mitchell), ("Litvak's First Lawsuit").

**ANSWER:**     Admitted.

118.     In Litvak's First Lawsuit, Litvak alleged that Bernard executed a "Secured Promissory Note" and a "Senior Secured Credit Agreement" which was "dated as of August 20, 2015", pursuant to which Bernard borrowed "up to $500,000" from his wife "to pay legal and accounting expenses for litigation in Colorado, New York, and perhaps elsewhere related to his sister Joanne Black," pursuant to the "Senior Secured Credit Agreement."

**ANSWER:**     Admitted.

119.     Among the provisions contained in the "Senior Secured Credit Agreement":

a.     Bernard's debt to his wife purported to be "senior to all other indebtedness of Bernard Black, other than any mortgage on [Litvak's and Bernard's] family house located at 2829 Sheridan Place, Evanston IL 60201.

b.     the debt was also secured by "all current and future wages and bonuses from Northwestern University or any other employer;" "all consulting income;" "payments for any use of his assets, including rent;" and "interest payments on any loans that he makes."

c.     Bernard's debt to Litvak was also secured by Litvak's own financial assets and "items located inside and around [Litvak's and Bernard's] house located at 2829 Sheridan Place, Evanston IL 60201, including the house, garage, yards, and driveway."

d.     Litvak purportedly "has the right to enforce her demand for payment, including early repayment, ... [by] requiring [her husband] to change the location for direct deposit of his paycheck from Northwestern University to an account solely in the name of [Litvak];" "requiring Bernard ... to receive his paycheck in physical form,

and then to promptly endorse the check to [Litvak];" and "establishing a garnishment order on the wages of Bernard."

    e.    Bernard agreed his wife could confess judgment against him by, upon any event of default, Litvak appearing in court and confessing judgment against Bernard for an unpaid amount evidenced by an affidavit signed by Litvak.

    f.    Bernard would have defaulted by "[a]ny attempt by any other party, whether or not successful, to challenge any transfer of assets from an account held jointly by Bernard Black and [his wife, Litvak] to an account held solely by [Litvak]."

**ANSWER:**    Admitted.

120.    In Litvak's First Lawsuit, Litvak alleged she made a demand for repayment on February 26, 2016.

**ANSWER:**    Admitted.

121.    Despite demanding repayment, Litvak specifically noted in her in her "Demand for Repayment" that she "retains the discretion to provide further loans to [Bernard] under the [Senior Secured Credit Agreement]."

**ANSWER:**    The Demand speaks for itself.

122.    In Litvak's First Lawsuit, Litvak alleged: "there was principal of $313,511.89, interest of $48,169.65, and at least $27,824.00 of legal fees and costs, due and owing under the Note," for a total balance due from Bernard to Litvak of $389,505.54, plus $118.91 per diem after November 30, 2016 - not including expenses, costs, charges and fees she also sought to collect by garnishing Bernard's wages.

**ANSWER:**    Admitted.

123.    On December 9, 2016, two days after Litvak's First Lawsuit was filed, Bernard agreed to a judgment against him in the amount of $394,631.74, and Litvak filed a Motion for Entry of Agreed Judgment.

**ANSWER:**    Admitted.

124.    Neither Litvak nor Bernard notified Joanne, her conservator, or Dain of Litvak's First Lawsuit, Bernard's agreement to a judgment in favor of Litvak, or Litvak's garnishment of Bernard's wages and other efforts to collect from Bernard.

**ANSWER:**    Admitted.

125.     Less than 2 weeks after filing Litvak's First Lawsuit, Bernard had agreed to and the court had entered judgment in the amount of $394,631.74, including payment of Litvak's legal fees and costs.

**ANSWER**:     Defendants deny the allegations of paragraph 125 because Bernard did not file Litvak's First Lawsuit.  Answering further, the judgment in Litvak's First Lawsuit speaks for itself.

126.     By December 21, 2016, Litvak had filed an affidavit for wage deduction summons  directed to Northwestern University.

**ANSWER**:     Admitted.

127.     Litvak received her Agreed Wage Deduction Turnover Order by January 26, 2017  garnishing Bernard's wages from Northwestern University.

**ANSWER**:     Defendants admit that a Wage Deduction Order was entered on January 26, 2017, but state that Bernard's wages are not currently being garnished under this order because they already are being garnished under a prior order in favor of Dal.

### Litvak's Second Lawsuit

128.     On September 26, 2017, Litvak filed a lawsuit against Bernard and Samuel as co-  trustees of the SNT, 2013 Trust, and Issue Trust, *Litvak v. Black*, Cook County Case No. 2017-L-  009743 (Hon. James E. Snyder), ("Litvak's Second Lawsuit").

**ANSWER**:     Admitted.

129.     In Litvak's Second Lawsuit, Litvak alleged that, by October 1, 2016, Bernard and  Samuel, on behalf of the SNT, 2013 Trust, and Issue Trust, jointly and severally, executed a Note in favor of Litvak in the amount of $601,321.00 to pay Bernard's, Samuel's and Litvak's attorneys'  fees litigating against Joanne's interest.

**ANSWER**:     The complaint in Litvak's Second Lawsuit speaks for itself.

130.     Litvak alleged that pursuant to a "Loan and Security Agreement," before October 1, 2016, the Trusts had borrowed from Litvak $101,321.00, that amount was due and owing, but the  Trusts had not repaid Litvak.

**ANSWER:**     The complaint in Litvak's Second Lawsuit speaks for itself.

131.     Nonetheless, Litvak agreed to "loan" the Trusts an additional $500,000 as of October 1, 2016.

**ANSWER:**     The complaint in Litvak's Second Lawsuit speaks for itself.

132.     Pursuant to that "Loan and Security Agreement," Bernard and Samuel pledged to Litvak as security on behalf of the Trusts, among other things, the accounts and assets of the Trusts, and all tort and arbitration claims the Trusts, Bernard, and Samuel may have against court-appointed conservators, court-appointed guardian ad litem, and court-appointed legal counsel for Joanne, Dain, Chase, and others.

**ANSWER:**     The Loan and Security Agreement speaks for itself.

133.     The amounts which Litvak identified in Litvak's Second Lawsuit as amounts allegedly made on behalf of and "loaned" to the Trusts jointly and severally by Litvak were not for the benefit of the SNT, 2013 Trust, or Joanne.

**ANSWER:**     Denied.

134.     For example, Litvak claims she "loaned" money to the Trusts jointly and severally by way of a payment she made on June 25, 2016 in the amount of $20,000 to attorneys Halling Cayo from "HELOC1001" for "Pinto-Wrigley and Dain suits"; a payment on July 3, 2016 in the amount of $11,131.00 to attorneys Barnes and Thornburgh to "unfreeze Issue Trust"; a payment on July 17, 2016 in the amount of $15,000 to attorneys Halling Cayo for "Pinto-Wrigley and Dain suits"; a payment on September 2, 2016 in the amount of $1,275.00 to attorneys Barnes and Thornburgh to "unfreeze Issue Trust"; a payment on September 3, 2016 in the amount of $20,000 to New York attorney Sharan Abraham for "Pinto Wrigley and Dain suits."

**ANSWER:**     Litvak's claims and the Loan and Security Agreement, including exhibits, speak

for themselves. To the extent the count diverges therewith, it is denied.

135.     The "First Amendment to Demand Note (Secured) and Loan and Security Agreement" attached to Litvak's complaint claims she "loaned" money to the Trusts jointly and severally made in the amount of $5,000.00 on November 24, 2016 to Attorney Arden Besunder; in the amount of $42,000.00 on August 8, 2016 and $33,056.89.00 on September 4, 2016 to attorneys Davis Graham; in the amount of $24,364.42 on August 8, 2016 to attorneys HarperHofer; in the amount of $3,650.00 on September 20, 2016 and $9,232.00 on November 16, 2016 to attorneys Adelman Gettleman.

**ANSWER:**     Litvak's complaint and the exhibits thereto speak for themselves.

136.     None of the foregoing payments were made for Joanne's benefit, but were for attorneys' fees incurred for litigation either unrelated to or directly contrary to Joanne's interest.

**ANSWER:**     Denied.  Answering further, the loans were made to benefit the trusts and defend the trusts and their trustees against attacks from Dain and others.

137.     In Litvak's Second Lawsuit, she alleged the SNT, 2013 Trust, and Issue Trust "are currently indebted, jointly and severally," to her pursuant to the "certain Demand Note (Secured) dated October 1, 2016" as amended by another purported "Demand Note Secured and Loan and Security Agreement dated as of December 21, 2016."

**ANSWER:**     The complaint in Litvak's Second Lawsuit speaks for itself.

138.     Litvak alleged the SNT, 2013 Trust, and Issue Trust "are and have been in default," and that she "has made demand for payment under the terms of the Note, as is reflected in the demand email that is attached" to her complaint.

**ANSWER:**     The complaint in Litvak's Second Lawsuit speaks for itself.

139.     The September 25, 2017 "demand email" attached to Litvak's complaint, was sent fewer than 24 hours before Litvak filed Litvak's Second Lawsuit, was sent by counsel with a copy  to Litvak and her cousin, Dal.

**ANSWER:**     Defendants admit that the demand letter attached as an exhibit to the complaint in Litvak's Second Lawsuit was sent on September 25, 2017, with copies to Litvak and Dal, and that the complaint was filed on September 26, 2017.

140.     Neither Litvak nor Bernard or Samuel sent demand or other notice to Joanne, her  conservator, or co-trustee Dain.

**ANSWER:**     Defendants lack information sufficient to form a belief as to the truth or falsity of paragraph 140 and the paragraph is therefore denied.

141.     Litvak sought an alleged $376,464.88 in principal, $18,431 in interest, and continuing  interest.

**ANSWER:**     The complaint in Litvak's Second Lawsuit, including the amounts she was

seeking to recover, speaks for itself.  To the extent the paragraph differs therefrom, it is denied.

142.     Litvak also sought "at least $13,671.05" in attorneys' fees and costs she

claims to have spent by September 25, 2017, as well as those she incurred thereafter in

obtaining the Agreed Judgment from her husband Bernard and his son Samuel against the Trusts.

**ANSWER:**     The complaint in Litvak's Second Lawsuit, including the amounts she was

seeking to recover, speaks for itself. To the extent the paragraph differs therefrom, it is denied.

143.     By September 27, 2017 the day after she filed her complaint against Bernard

and Samuel, Bernard had executed an Acknowledgement of Receipt of Summons and

Complaint.

**ANSWER:**     Defendants admit that Bernard signed an Acknowledgement of Receipt of

Summons and Complaint in Litvak's Second Lawsuit on September 27, 2017.  Answering

further, Defendants cannot answer the remaining allegations in that they do not know to whom

the word "she" is referring.

144.     Bernard and Samuel both signed an Agreed Judgment on October 2, 2017,

only a week after filing her complaint, Litvak, filed a Motion for Entry of Agreed Judgment on

October 3,  2017.

**ANSWER:**     Admitted.

145.     On October 25, 2017, with no counsel appearing for the defendant trusts, the

Court entered the Agreed Judgment.

**ANSWER:**     Defendants admit that, on October 25, 2017, with no counsel appearing for the

defendant trusts, the court in Litvak's Second Lawsuit entered an Agreed Judgment.

146.     Having wrongfully obtained the Agreed Judgment from the court, Bernard,

Samuel and Litvak are using the Agreed Judgment to take the same assets (Joanne's) from the

same sources  (the SNT, 2013 Trust, and Issue Trust) which Bernard is prohibited from doing by

orders of the DPC and in breach of their duties to Joanne.

**ANSWER:**     Denied.

147.     What remains of Joanne's POD assets and other inheritance that Bernard, Samuel, Litvak, and Dal have not yet been able to divert and convert to their own uses are currently held by Chase.

**ANSWER:**     Defendants admit that Chase holds assets that were contributed to the Trusts when the DPC approved the disclaimer.  Defendants deny that Bernard, Samuel, Litvak or Dal have diverted or converted for their own use any such assets.  Answering further, Defendants state that Dain has wasted substantial SNT assets on wrongful litigation.

148.     On November 8, 2017, Litvak served on Chase Bank and JPMS LLC citation notices as supplemental proceedings to collect the judgment in the Litvak's Second Lawsuit.

**ANSWER:**     Defendants admit the allegations of paragraph 148, except that they deny the citations notices were served on November 8, 2017, stating that they were served on November 7, 2017.

149.     By obtaining an Agreed Judgment against the Trusts and issuing citations, Litvak,  Bernard, and Samuel seek to force Chase, by Court order in favor of Litvak (rather than Bernard), to  allow them to access the same funds in the Trusts which orders of other courts prohibited Bernard  from accessing and in breach of fiduciary duties owed to Joanne, and which Chase may have  considered in refusing to allow Bernard and Samuel to access the funds in the Trusts.

**ANSWER:**     Denied.

150.     On September 26, 2017, Dal filed a third lawsuit against Bernard and Samuel as  trustees of the SNT, 2013 Trust, and the Issue Trust, based on alleged "loans" made to pay Bernard's attorneys' fees, *Dal v. Black*, Cook County Case No. 2017-L-009744 (Hon. Thomas R. Mulroy) ("Dal's Third Lawsuit").

**ANSWER:**     Admitted.

151.     Dal did not name as a defendant or otherwise give notice of her lawsuit to Joanne, her conservator, or co-trustee Dain, nor had she given them notice of any alleged loan she entered into with Bernard and Samuel purporting to bind the Trusts.

**ANSWER:**    Admitted.

152.    No attorney entered an appearance on behalf of the Trusts in Dal's Third Lawsuit.

**ANSWER:**    Denied.

153.    The complaint in Dal's Third Lawsuit is nearly identical to the complaint in Litvak's Second Lawsuit, filed by the same lawyers and relying on the same "demand" email to Bernard, Samuel, Litvak, and Dal.

**ANSWER:**    Denied. Answering further, the two lawsuits involve different loans, in different amounts, from different lenders, at different times, and the complaints otherwise speak for themselves.

154.    Both Litvak's and Dal's complaints were based on nearly identical "loans" they alleged to have made to Bernard and Samuel as trustees of the Trusts to pay the attorneys' fees Bernard, Samuel, and Litvak incurred in repeatedly litigating against Joanne's interests, as well as Litvak's and Dal's fees in suing the Trusts to use Joanne's money to pay for Bernard's, Samuel's, and Litvak's attorneys' fees.

**ANSWER:**    Denied. Answering further, the complaints speak for themselves.

155.    Both Litvak and Dal alleged that they had each, separately loaned money to the Trusts, which acted through Bernard and Samuel, to pay Bernard's, Samuel's and Litvak's attorneys' fees between May 11, 2016 and December 3, 2016, and each, separately alleged the Trusts "are currently indebted, jointly and severally, to the Plaintiff pursuant to that certain Demand Note (Secured) dated October 1, 2016," as amended by another purported "Demand Note Secured and Loan and Security Agreement dated as of December 21, 2016."

**ANSWER:**    Denied. Answering further, the complaints speak for themselves.

156.    Dal alleged that, by October 1, 2016, Bernard and Samuel, on behalf of the SNT, 2013 Trust, and Issue Trust, jointly and severally, executed a Note in favor of Dal in the amount of $572,228.00 to pay Bernard's, Samuel's and Dal's attorneys' fees.

**ANSWER:**    Denied. Answering further, the complaint and Note underlying Dal's Third Lawsuit speak for themselves.

157.    The "Loan and Security Agreement," recites that before October 1, 2016, the Trusts had borrowed from Dal $72,228.00, that amount was due and owing, the Trusts had not repaid Dal, but nonetheless Dal agreed to "loan" the Trusts an additional $500,000 as of October 1, 2016.

**ANSWER:**    Denied.

158.    Pursuant to that "Loan and Security Agreement," Bernard and Samuel pledged to Dal as security on behalf of the Trusts, among other things, the accounts and assets of the Trusts and all tort and arbitration claims the Trusts, Bernard, and Samuel may have against court-appointed conservators, court-appointed guardian ad litem, and court-appointed legal counsel for Joanne, Dain, Chase, and others.

**ANSWER:**    Denied.

159.    The amounts which Dal identified in Dal's Third Lawsuit as amounts allegedly made on behalf of and "loaned" to the Trusts jointly and severally by Dal were not for the benefit of the SNT, 2013 Trust, or Joanne.

**ANSWER:**    Defendants lack information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 159 insofar as they are confusing, vague and uncertain.

160.    For example, Dal claims she "loaned" money to the Trusts jointly and severally by way of payments she made to attorneys Halling Cayo on August 8, 2016 in the amount of $4,000, September 21, 2016 in the amount of $1,478.00, and September 22, 2016 in the amount of $25,000.00; and further that she "loaned" money to the Trusts jointly and severally by way of payments she made to attorney Sharan Abraham on May 11, 2016 in the amount of $17,000, June 26, 2016 in the amount of $17,000.00, August 13, 2016 in the amount of $8,000.00, and November 5, 2016 in the amount of $20,000.00.

**ANSWER:**    The complaint for Dal's Third Lawsuit, including exhibits stating loan amounts, speaks for itself.

161.    Halling Cayo and Sharan Abraham are some of a number of lawyers and law firms representing Litvak in her lawsuit pending in the Northern District of Illinois, *Katherine Black v. Wrigley*, et. al, NDIL Case No. 1:17-cv 00101 (Hon. Matthew F. Kennelly).

**ANSWER:**    Defendants admit that Halling & Cayo and Sharan Abraham represent Litvak in the referenced lawsuit, but deny the remaining allegations in of paragraph 161.

162.     Halling Cayo and Sharan Abraham also represent Samuel, Sarah, Daniel, and Jacob Black in their ongoing lawsuit against Dain and others, *Samuel H Black, et. al v. Dain*, et al., U.S. Dist. Court for the Eastern Dist. of New York, Case No. 16-cv-01238 (Hon. Carol Bagley Amon).

**ANSWER:**     Admitted.  Answering further, Defendants state that the beneficiaries of the Issue

Trust, which is a beneficiary of the SNT, brought the referenced lawsuit on behalf of the Issue

Trust and the SNT.

163.     Dal further claims in Dal's Third Lawsuit that she "loaned" money to the Trusts  jointly and severally by way of payments she made to attorneys HarperHofer on May 11, 2016 in the  amount of $15,880.95 and a double payment on May 11, 2016 in the amount of $15,880.95.

 **ANSWER:**     Admitted.

164.     HarperHofer represented Bernard during the forensic accounting of his breach of  fiduciary duties in the conservatorship suit he initiated in the DPC, which resulted in the Colorado  Judgment against Bernard.

**ANSWER:**     Admitted.

165.     Dal's complaint claims she "loaned" money to the Trusts jointly and severally by way  of payments she made to attorneys Davis Graham in the amount of $50,965.29 on May 11, 2016, a  double payment of $51,000.00 on June 26, 2016, in the amount of $70,000.00 on October 24, 2016,  in the amount of $40,000.00 on November 5, 2016, and in the amount of $25,000.00 on November 24, 2016.

**ANSWER:**     Admitted. Answering further, each loan was made to one or more trusts, no bill

was paid twice, and under the Note for the loans, the trusts are jointly and severally obligated to

repay all loans.

166.     Davis Graham also represented Bernard in the conservatorship suit he initiated in the  DPC, which resulted in the Colorado Judgment.

**ANSWER:**     Denied.

167.   Dal's complaint claims she "loaned" money to the Trusts jointly and severally by way of payments she made in the amount of $8,601.55.00 on May 11, 2016 and $722.50 on September 21, 2016 to attorneys Barnes and Thornburg.

**ANSWER:**   Admitted.  Answering further, each loan was made to one or more trusts, and under the Note for the loans, the trusts are jointly and severally obligated to repay all loans.

168.   Barnes and Thornburgh represented Bernard and Samuel in their lawsuit against Joanne, *Black v. Black*, Case No. 1:16-cv-01763 (Hon. Virginia M. Kendall).

**ANSWER:**   Admitted, except that, answering further, Defendants state that the referenced case was not a lawsuit, but rather a declaratory judgment action in which Joanne was named as a nominal party only and in which no relief was sought from or against her.

169.   Dal's complaint claims she "loaned" money to the Trusts jointly and severally by way of payments she made in the amount of $516.75 on August 13, 2016 and $8,000.00 on October 16, 2016 to attorneys Arden Besunder.

**ANSWER:**   The complaint for Dal's Third Lawsuit, including exhibits stating loan amounts, speaks for itself.  Answering further, each loan was made to one or more trusts, and under the Note for the loans, the trusts are jointly and severally obligated to repay all loans.

170.   Arden Besunder represents Bernard in his accounting lawsuit in New York, *In re Black*, Surrogate's Court of the State of New York County of Westchester File No. 20012/1209/A  (Hon. Thomas P. Aliotta).

**ANSWER:**   Denied.  Answering further, Arden Besunder represents Bernard Black, in his capacity as Executor of the Estate of Renata Black in Surrogate's Court for Westchester County, New York. Besunder did not represent Bernard Black before J. Aliotta, who is a judge in the NY Supreme Court.

171.   Dal's complaint claims the Trusts are jointly and severally for payment she made in the amount of $8,089.80 on November 11, 2017 to attorneys Adelman Gettleman.

**ANSWER:**     Admitted. Answering further, each loan was made to one or more trusts, and under the Note for the loans, the trusts are jointly and severally obligated to repay the reasonable legal expenses of lender's' counsel.

172.     Adelman Gettleman represents Litvak and Dal in their Cook County lawsuits against Bernard, personally, and against the Trusts, and in Litvak's lawsuit against Cherie and others pending in this District, *Katherine Black v. Wrigley*, et al., Case No. 1:17-cv-00101.

**ANSWER:**     Denied.

173.     In Dal's Third Lawsuit, Dal sought an alleged $322,709.84 in principal, $13,160.98 in interest, and continuing interest.

**ANSWER:**     Admitted.

174.     Dal also sought "at least $6,658.00" in attorneys' fees and costs she claims to have spent by September 25, 2017, as well as those she incurred thereafter in obtaining the Agreed Judgment from her husband Bernard and his son Samuel against the Trusts.

**ANSWER:**     Admitted.

175.     By September 27, 2017 the day after Litvak and Dal filed their complaints against Bernard and Samuel as trustees of the Trusts, Bernard had executed an Acknowledgement of Receipt of Summons and Complaint on behalf of the Trusts.

**ANSWER:**     Admitted.

176.     Once Samuel executed an Acknowledgement of Receipt of Summons and Complaint on behalf of the Trusts and Bernard and Samuel both signed an Agreed Judgment on behalf of the Trusts on October 2, 2017, only a week after filing the complaint, Litvak and Dal each filed a Motion for Entry of Agreed Judgment on October 3, 2017.

**ANSWER:**     Admitted.

177.     On October 12, 2017, pursuant to Bernard's and Samuel's written agreement on behalf of the Trusts, the Court entered an Agreed Judgment against the Trusts in the amount of $348,936.93, plus accruing interest, in favor of Dal in Dal's Third Lawsuit.

**ANSWER:**     Admitted.

178.    Having wrongfully obtained the Agreed Judgment from the court, Bernard, Samuel Litvak, and Dal are using the Agreed Judgment to take the same assets (Joanne's) from the same sources (the SNT, 2013 Trust, and Issue Trust) Bernard is prohibited from doing by orders of the DPC and in breach of their duties to Joanne.

**ANSWER:**    Denied.

179.    What remains of Joanne's POD assets and other inheritance that Bernard, Samuel, Litvak, and Dal have not yet been able to divert and convert to their own uses are currently held by Chase.

**ANSWER:**    Denied.

180.    On November 8, 2017, Dal and Litvak each served on Chase Bank and JPMS LLC citation notices as supplemental proceedings to collect the judgment in the instant lawsuit.

**ANSWER:**    Defendants admit the allegations of paragraph 180 except that they deny that the citation notices were served on November 8, 2017, stating that they were served on November 7, 2017.

181.    By obtaining an Agreed Judgment against the Trusts and issuing citations, Dal, Litvak, Bernard, and Samuel seek to force Chase, by Court order in favor of Dal (rather than Bernard), to allow them to access the same funds in the Trusts which orders of other courts prohibited Bernard from accessing and in breach of fiduciary duties owed to Joanne, and which Chase may have considered in refusing to allow Bernard and Samuel to access the funds in the Trusts.

**ANSWER:**    Denied. Answering further, Defendants lack sufficient information to affirm or deny what factors Chase may have considered in various decisions.

182.    The March 17, 2016 judgment against Bernard was subsequently upheld by the Colorado Court of Appeals on January 25, 2018. *In re the Interest of Black*, 2018 COA 07 (Col. Ct. of App.). Separate unpublished orders directed the DPC to make certain additional findings on remand.

**ANSWER:**    The decisions of the Colorado Court of Appeals on January 25, 2018 speak for themselves. Answering further, the Colorado Court of Appeals determined that the DPC had not

made factual findings with respect to jurisdiction over the SNT or its trustees sufficient to support its orders concerning the SNT and remanded the matter to the DPC to make those jurisdictional findings.

183.    On the same day, the Denver Probate Court entered an Order finding that it had jurisdiction of Bernard Black, Anthony Dain, and the assets held in the SNT and Issue Trust accounts at Chase Bank and JPMS LLC. The Order further vacated its prior order authorizing Bernard to disclaim Joanne's interest in the POD assets. Finally, the DPC ordered that "[a]ll funds disclaimed pursuant to this Order shall be immediately returned and placed into the Registry of the Denver Probate Court pending further proceedings regarding disposition of said funds." That includes the assets currently in the IT and SNT accounts held at Chase Bank and JPMS LLC.

**ANSWER:**    Denied.  The DPC did not issue any order on January 25, 2018.

184.    On June 29, 2018, a unanimous panel of the Colorado Court of Appeals issued an Order denying Bernard's Motion to Stay the April 27, 2018 Order of the Denver Probate Court.

**ANSWER:**    Admitted.

**Prayer for Relief**

Wherefore, Defendants pray that the Court enter judgment in their favor on these cross-claims and against Anthony Dain, individually and as trustee and Jeanette Goodwin as conservator for Joanne Black.

Respectfully submitted,                    KATHERINE LITVAK and OLGA DAL


                                      By: /s/David F. Hyde
                                          One of Their Attorneys

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 11, 2018, I filed the foregoing document electronically, via Electronic Case Filing (ECF), which shall send notice to all counsel of record.


/s/ Eugene E. Murphy, Jr.