**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, et al., | ) ) ) | |
| Plaintiffs-in-Interpleader, | ) ) | No. 18-cv-03447 |
| v. | ) ) | Judge Andrea R. Wood |
| BERNARD S. BLACK, et al., | ) ) | |
| Defendants-in-Interpleader. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this interpleader action brought pursuant to 28 U.S.C. § 1335, Plaintiffs JPMorgan

Chase Bank, National Association, and J.P. Morgan Securities LLC (collectively, "JPMorgan")

hold several million dollars in assets originating from Renata Black ("Renata"), who passed away

in 2012. Those assets are subject to conflicting claims by the seven named Defendants, who

include Renata's son, Defendant Bernard Black ("Bernard"), her daughter, Defendant Joanne

Black ("Joanne"), and Bernard's son, Defendant Samuel Black ("Samuel").[1] The conflicting

claims have led to extensive, highly-contentious litigation over the assets in multiple jurisdictions

and have resulted in numerous court judgments and arbitration awards. The present Memorandum

Opinion disposes of several motions and requests for relief pending before this Court.

**BACKGROUND**

This case concerns several million dollars in assets that JPMorgan holds in bank and

brokerage accounts. (Compl. ¶ 1, Dkt. No. 1.) The assets came from Renata, who is Bernard and

Joanne's mother. (*Id.* ¶ 2.) Before her death in 2012, Renata established two trusts with

---

[1] This case involves several members of the Black family, to whom the Court refers by their first names to distinguish them.

JPMorgan. (*Id.*) Bernard and his children are the beneficiaries of the Issue Trust ("IT"), and Joanne, who is disabled, is the beneficiary of the Supplemental Needs Trust ("SNT," collectively "Trusts"). (*Id.* ¶¶ 2, 5–6.) At the time JPMorgan filed the Complaint, Bernard, his son Samuel, and Joanne's cousin Anthony Dain were co-trustees of the SNT, and Bernard and Samuel were co-trustees of the IT. (*Id.* ¶¶ 5–6.) When Renata died, Bernard was appointed as the executor of her estate. (*Id.* ¶ 28.) Renata died with about $3.5 million in her brokerage accounts. (*Id.* ¶ 29.) Her will provided that one-third of her estate would go to the IT and two-thirds would go to the SNT. (*Id.* ¶ 28.) Unbeknownst to Defendants, however, Renata had executed payable-on-death ("POD") beneficiary designations on her brokerage accounts directing that almost all the funds in the accounts be passed directly to Joanne, bypassing the Trusts. (*Id.* ¶ 29.)

Since Renata's death, there has been extensive litigation over the ownership of the disputed funds in Colorado, Illinois, and New York. (*Id.* ¶ 3.) For convenience, the seven Defendants in this interpleader suit can be classified as belonging to three competing groups. (*Id.* ¶ 4.) The first group consists of Joanne, Dain, and Jeanette Goodwin (Joanne's conservator, as appointed by the Denver Probate Court). (*Id.* ¶ 5.) The second group consists of Bernard and Samuel. (*Id.* ¶ 6.) The third group consists of Kate Litvak, who is Bernard's wife, and Dal, who is Litvak's cousin. (*Id.* ¶ 7.) Through litigation in various forums, these groups have obtained orders from state courts and arbitration panels that present JPMorgan with conflicting duties. (*Id.* ¶ 8.) JPMorgan sought joint instructions from Defendants but they have been unable to agree on how the conflicts should be resolved. (*Id.* ¶ 12.) The procedural history of the various lawsuits and arbitrations, as alleged in the Complaint, is as follows.

## I. Colorado State Court Proceedings

Joanne was living in Colorado when Renata died in 2012. (*Id.* ¶ 30.) When Bernard learned of the POD designations, he successfully petitioned the Denver Probate Court ("DPC") to appoint him as Joanne's conservator. (*Id.*) As conservator, Bernard disclaimed the POD assets on Joanne's behalf and directed the deposit of about $1.5 million from Renata's estate into the IT and about $2 million into the SNT. (*Id.*) Those assets ("Interpleaded Assets"), which initially totaled about $3.5 million, constitute the disputed property that is the subject of this action. (*Id.*)

In September 2015, the DPC found that Bernard had breached his fiduciary duty and committed civil theft by depositing $1.5 million of the POD assets into the IT for the benefit of himself and his children. (*Id.* ¶ 31.) The court surcharged him approximately $1.5 million and assessed treble damages of approximately $4.5 million. (*Id.*) Nonetheless, the DPC did not reverse Bernard's actions; the funds he deposited into the IT remain there. (*Id.*)

After finding Bernard liable for surcharges and damages, the DPC appointed Goodwin as Joanne's new conservator and authorized Dain to act as the sole trustee of the SNT. (*Id.* ¶ 32.) Bernard, meanwhile, appealed the DPC's orders that assessed surcharges and damages against him. (*Id.* ¶ 33.) In January 2018, the Colorado Court of Appeals affirmed the DPC's assessment of surcharges and damages against Bernard in *Black v. Black* ("*Black I*"), 422 P.3d 592 (Colo. App. 2018). It also affirmed the DPC's decision not to reverse Bernard's disclaimer of the POD assets. (*Id.*)

In February 2016, the DPC ordered that Dain could use SNT funds to pay professional fees owed by Joanne for litigation matters between her and Bernard and Samuel. Bernard appealed that order as well, contending that the DPC did not have jurisdiction over the SNT's assets. A division of the Colorado Court of Appeals concluded that, although "the [DPC] has subject matter

jurisdiction over the administration of the conservatorship," the DPC erred by failing to make factual findings regarding jurisdiction, which prevented the appellate court from determining whether the DPC had jurisdiction over Bernard, Samuel, and the SNT. *Black v. Black* ("*Black II*"), 16CA0625, 2018 WL 549917, ¶¶ 22, 27–31 (Colo. App. Jan. 25, 2018).[2] Because the DPC could not authorize distributions from the SNT without first making express findings establishing its *in rem* jurisdiction over the SNT's funds, the DPC's February 2016 order was vacated and the case remanded so that the DPC could make jurisdictional determinations. *Id.* ¶¶ 32–33.

The DPC entered further orders. In January 2018, the DPC suspended Bernard and Samuel as trustees from all trusts benefitting Joanne, ruled that Bernard and Samuel were not allowed to act in regard to the Trusts' assets, and authorized Dain to use SNT funds to pay Joanne's professional fee expenses. *See Black v. Black* ("*Black III*"), 482 P.3d 460, 471 (2020). Then, in April 2018, the DPC made jurisdictional findings that (1) it held continuing *in rem* jurisdiction over the POD assets, which it determined had been wrongly transferred out of the conservatorship by Bernard, and (2) it had personal jurisdiction over Bernard because he presented himself to the DPC as a trustee, thereby invoking its jurisdiction (and waiving his objections thereto). *See id.* at 471–72. The DPC also concluded that it had jurisdiction over Samuel because it retained jurisdiction over conservatorship funds belonging to Joanne and because of Samuel's fiduciary breaches. *See id.* at 472. The DPC vacated its March 2013 order authorizing Bernard to disclaim the POD assets—the process by which those assets were routed to the SNT and IT—and ordered Bernard to pay those funds back into the court's registry. *See id.*

---

[2] The *Black II* opinion is unpublished and the version cited here does not contain the text of the opinion; the cited paragraphs were referenced in a subsequent opinion of the Colorado Court of Appeals. *See Black v. Black*, 482 P.3d 460, 470 (2020).

Bernard and Samuel again appealed on several grounds, including (as relevant here) the DPC's jurisdiction over them and the Trusts, whether it properly voided the POD disclaimers, its authorization for Dain to use SNT assets to pay Joanne's professional fees, and its suspension of Bernard and Samuel as SNT trustees.[3] *Id.* The Colorado Court of Appeals agreed that the DPC lacked authority to void the POD disclaimers because it entered its order while *Black I* was pending review before the Colorado Supreme Court, divesting the DPC of jurisdiction at the time it entered its order. *Id.* The appellate court also reversed the DPC's decision to suspend Samuel as a trustee of the SNT, determining that the DPC failed to respect Samuel's due process rights by discharging him as a trustee of the SNT without giving him notice of that proceeding. *Id.*

The appellate court otherwise affirmed the DPC's orders. Specifically, the appellate court held that the DPC had *in rem* jurisdiction over the Trusts because the POD assets were wrongfully diverted from the conservatorship. *Id.* at 474. Likewise, the DPC had personal jurisdiction over Bernard because he submitted to the DPC's jurisdiction and also because he accepted appointment as Joanne's conservator. *Id.* at 475–80. The DPC also had authority to authorize distributions from the SNT to pay Joanne's professional fees because those funds "were at all times assets of Joanne's conservatorship." *Id.* at 482. Finally, according to the appellate court, the DPC did not err in suspending Bernard as a trustee of the SNT, finding that Bernard's actions to deprive Joanne of her inheritance and violations of DPC orders constituted an emergency warranting Bernard's suspension as trustee "to protect the conservatorship's assets." *Id.* at 483–84. The Colorado Supreme Court subsequently denied certiorari on an appeal of *Black III*. *In re Black*, No. 20SC554, 2021 WL 1030354 (Colo. Mar. 15, 2021).

---

[3] There is a third trust at issue in some of the cases discussed here: the "2013 Trust," which Bernard created to receive Joanne's workers' compensation benefits and Social Security disability insurance benefits. *Black III*, 482 P.3d at 483–84. That trust is not at issue in the litigation before this Court.

Proceedings remain ongoing before the DPC. On April 17, 2021, the DPC ordered the parties to schedule a hearing regarding whether the disclaimers should be voided and to address other issues following the *Black III* decision. (Defs.' Joint Status Report at 1, Dkt. No. 183.) In those proceedings, Bernard has contended that any further action by the DPC requires (1) a motion under Colorado civil procedure to reopen past decisions regarding the disclaimed funds, and (2) permission from this Court to allow an action involving withdrawal of the Interpleaded Assets to proceed. (*Id.* at 1–2.) Joanne also reminded the DPC of this Court's orders preventing withdrawals or transfers of the Interpleaded Assets without its permission. (*Id.* at 2.) On May 10, 2021, the DPC ordered Joanne to file motions regarding whether the disclaimers should be voided and how to dispose of the other issues that Joanne had identified, including exercising *in rem* jurisdiction over the POD assets, suspending Bernard and Samuel as trustees of all of the trusts (the IT, SNT, and 2013 Trust), and pursuing tort liability against Samuel. (*Id.*)

## II.    Other Proceedings

Dal previously sued Bernard and Samuel in the Circuit Court of Cook County alleging that, as trustees of the Trusts, they owed her about $342,538 for funds she advanced to the Trusts pursuant to a promissory note.[4] (Compl. ¶ 42.) The Illinois state court entered an agreed judgment, with Bernard's and Samuel's consent, in the amount of $348,936 in October 2017. (*Id.* ¶ 43.) Based on that agreed judgment, Dal sent out citations to discover assets and the Illinois state court imposed liens of about $697,873 on the Trusts' accounts. (*Id.* ¶ 44.) The liens are still in effect. (*Id.*) In November 2017, Dain moved to vacate the agreed judgment and quash the citations, and Goodwin intervened to join Dain's motion. (*Id.* ¶ 45.) But the judgment was upheld on appeal and

---

[4] Dal also sought repayment from the 2013 Trust. (Compl., Ex. 9, Dal Agreed Judgment, Dkt. No. 1-9.)

is now final. *Dal v. Black*, 2020 IL App (1st) 191348-U, ¶¶ 32–65 (Ill. App. Ct. 2020). The liens in Dal's case conflict with the DPC's orders.[5]

The same month that Dal filed her claims in Illinois state court, Goodwin—acting as Joanne's conservator—petitioned the Circuit Court of Cook County to register the foreign judgment against Black from the DPC. (Compl. ¶ 48.) In February 2018, Goodwin served citations to discover assets against Bernard, resulting in the imposition of liens in the amount of $8,611,639.38 on accounts associated with Bernard, including some of the Trusts' accounts. (*Id.* ¶¶ 49, 51.) Bernard has moved to vacate the registration of the Colorado judgment in Illinois state court. (*Id.* ¶ 50.) Nonetheless, Bernard consented to the entry of an agreed order that froze all of the accounts at issue until further order of the court. (*Id.* ¶ 52.)

Bernard and Samuel also filed two demands for arbitration against JPMorgan for conversion, breach of fiduciary duty, and breach of contract before the Financial Industry Regulatory Authority ("FINRA"). (*Id.* ¶¶ 53–54.) A panel of arbitrators held an evidentiary hearing in February 2018 and issued an arbitration award the following month. (*Id.* ¶ 55.) That award dismissed all of Bernard and Samuel's claims. (*Id.* ¶ 55.) It also froze all of the Trusts' funds, with exceptions for some personal needs of Joanne and of Bernard's children, until a final order directing otherwise is issued by the Colorado courts or the trustees all agree to unfreeze the funds. (Compl., Ex. 2, FINRA Arbitration Award at 6–7, Dkt. No. 1-2.)

### III. Proceedings Before this Court

In April 2018, Bernard and Samuel's counsel sent JPMorgan a letter stating that they would hold it responsible if it took any action toward the SNT's accounts, including implementing orders from the DPC. (Compl. ¶ 59.) On May 1, 2018, JPMorgan sought joint instructions from all

---

[5] Litvak also pursued an agreed judgment against Bernard and Samuel as trustees, but that judgment was vacated as a product of fraud. *Litvak v. Black*, 147 N.E.3d 835 (Ill. App. Ct. 2019).

parties on how to proceed. (*Id.* ¶ 61.) But the parties were unable to agree. (*Id.* ¶ 12.) JPMorgan then filed this interpleader suit, seeking to resolve the risk of conflicting liabilities and multiple litigation.

In its Complaint, JPMorgan asks this Court to order Defendants to interplead and resolve their respective legal rights to the Interpleaded Assets in this Court, to restrain Defendants from using other forums to affect the Interpleaded Assets, and to dismiss JPMorgan from the case and discharge it from liability. Defendants have appeared and filed crossclaims and counterclaims, which are not at issue in the pending motions. (Dkt. Nos. 19, 32.) In August 2018, the Court allowed JPMorgan to post a $4.2 million bond instead of depositing the disputed assets with the Court. (Dkt. No. 37.) In May 2019, the Court waived the requirement for JPMorgan to renew that bond. (Dkt. No. 68.) The Court also forbade JPMorgan from allowing withdrawals from the Interpleaded Assets or following instructions about the Interpleaded Assets from any person without the Court's approval and all parties from using litigation in other forums to effect a turnover or withdrawal of the Interpleaded Assets. (Dkt. No. 69.)

## DISCUSSION

### I.    Subject-Matter Jurisdiction

The Court first turns to the threshold issue of subject-matter jurisdiction. Dain and Goodwin move to dismiss this interpleader action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. (Dkt. No. 160.) They contend that this Court cannot dispose of the Interpleaded Assets because the DPC has already taken *in rem* jurisdiction over those assets.

Under Rule 12(b)(1), a party may make either a factual or facial challenge to subject-matter jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). A facial challenge

requires "only that the court look to the complaint and see if the plaintiff has sufficiently ***alleged*** a basis of subject matter jurisdiction." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). By contrast, "a factual challenge lies where the complaint is formally sufficient but the contention is that there is ***in fact*** no subject matter jurisdiction." *Id.* at 444 (internal quotation marks omitted). Where, as here, a defendant mounts a factual challenge, "the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *Silha*, 807 F.3d at 173. Ultimately, the proponent of jurisdiction bears the burden of proving by a preponderance of the evidence that jurisdiction exists. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 237 (7th Cir. 1995).

### A. Elements of Statutory Interpleader

As an initial matter, JPMorgan has properly pleaded the jurisdictional requirements for an interpleader action and Defendants have not challenged the factual accuracy of those allegations. Pursuant to 28 U.S.C. § 1335(a), district courts have original jurisdiction over interpleader cases in which the stakeholder possesses money or property worth $500 or more if two conditions are met.[6] The first condition is that there are least two claimants who have adverse claims to the money or property and are of diverse citizenship. *Id.* § 1335(a)(1). Those claims must create a "real and reasonable fear of double liability or conflicting claims" for the stakeholder. *Aaron v. Mahl*, 550 F.3d 659, 663 (7th Cir. 2008). The second condition is that the plaintiff must either deposit the money or property with the district court registry or "give[] bond payable to the clerk of the court in such amount and with such surety as the court or judge may deem proper, conditioned upon the compliance by the plaintiff with the future order or judgment of the court

---

[6] Filing an interpleader case pursuant to these statutes is known as "statutory interpleader." Federal Rule of Civil Procedure 22 also authorizes the filing of interpleader cases; such actions are known as "rule interpleader." Here, no party has raised any issue concerning rule interpleader.

with respect to the subject matter of the controversy." 28 U.S.C. § 1335(a)(1). To effect its

purpose of protecting stakeholders from multiple liability or conflicting claims, the interpleader

statute must "be liberally construed." *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 533

(1967) (liberally construing 28 U.S.C. § 1335 to conclude that a stakeholder need not wait for

claimants to obtain final judgments before initiating an interpleader action).

JPMorgan has established the prerequisites for subject-matter jurisdiction. It has pleaded

that the property at issue is worth several million dollars—far more than the $500 required.

Defendants' answers confirm the approximate value of the property, as do the state court orders

and arbitration award attached to JPMorgan's Complaint.[7] (*See* Compl., Exs. 1–13, Dkt. Nos. 1-1–

1-13.) There are multiple Defendants who have adverse claims to the Interpleaded Assets and are

of diverse citizenship. Goodwin, Dain, and Joanne are citizens of Colorado, California, and New

York, respectively. They are adverse to Bernard, a citizen of Illinois; Samuel, a citizen of

Maryland; Litvak, a citizen of Illinois; and Dal, a citizen of Washington State. Therefore, there are

at least two diverse claimants with adverse claims. And the adverse claims have put JPMorgan in

reasonable fear of multiple liability. *See Aaron*, 550 F.3d at 663. JPMorgan does not need to show

which, if any, of the claims will be meritorious. *See Union Cent. Life Ins. Co. v. Hamilton Steel*

*Prods., Inc.*, 448 F.2d 501, 503–04 (7th Cir. 1971). So far, the adverse claims have generated

conflicting orders from two state courts and one arbitration panel. That is more than sufficient to

show a reasonable fear of multiple liability.

By depositing a bond in accordance with this Court's orders, JPMorgan satisfied the final

jurisdictional requirement of either depositing the disputed property or posting a bond. *See* 28

U.S.C. § 1335(a)(1). True, the Court later waived the requirement that JPMorgan renew the bond

---

[7] The Court may take judicial notice of these state court orders and arbitration awards, which are matters of public record. *See Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 1124, 1128 n.2 (7th Cir. 2012).

and did not order JPMorgan to deposit the disputed property. But the existence of subject-matter jurisdiction over an interpleader action is determined at the outset of the case and is not disturbed by subsequent events. *See Walker v. Pritzker*, 705 F.2d 942, 944 (7th Cir. 1983); *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 798–99 (7th Cir. 1980).

### B.     Prior Exclusive Jurisdiction Doctrine

Next, Dain and Goodwin contend that this case must be dismissed pursuant to the prior exclusive jurisdiction doctrine, which holds that:

> [If] two suits are in rem, or quasi in rem, so that the court . . . has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought the jurisdiction of the one court must yield to that of the other.

*Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). The court holding prior jurisdiction need not "actually seiz[e]" the disputed property; it is enough that the earlier suit was "brought to marshal assets, administer trusts, or liquidate estates, [or was a] suit[] of a similar nature where, to give effect to its jurisdiction, the court must control the property." *Id.* at 466. But both suits must be *in rem* or *quasi in rem* for the doctrine to apply. *See Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 536 (7th Cir. 2018).

The DPC has *in rem* jurisdiction over the Interpleaded Assets.[8] In *Black III*, the Colorado Court of Appeals explained:

> [A] probate court may exercise in rem jurisdiction over conservatorship property that was transferred outside the state through its continuing jurisdiction over such property . . . Bernard's unilateral acts—seeking a Colorado conservatorship over Joanne and then improperly transferring assets from the conservatorship to out-of-

---

[8] The *Black III* decision affirmed the DPC's conclusion that "***all*** of the funds Bernard Black transferred into the [Trusts] that are at issue in this action were sourced from the [POD] accounts naming Joanne Black as the sole or primary beneficiary." 482 P.3d at 474. The record indicates that almost all of Renata's estate consisted of the POD assets, but there were other assets that would have flowed to the IT and SNT, such as her residual estate. *Black I*, 422 P.3d at 597. In any event, the Interpleaded Assets, as defined by JPMorgan in the Complaint, consist entirely of the POD assets. (Compl. ¶ 30.)

state trusts—did not convert the assets from conservatorship assets into assets of
the Trusts, or mean that those assets never touched Colorado.

482 P.3d at 474–75. Thus, the DPC continues to hold *in rem* jurisdiction over the Interpleaded
Assets, which are now held in accounts belonging to the Trusts.

JPMorgan asserts that the DPC lacks *in rem* jurisdiction because it does not have actual
control over the Interpleaded Assets, which are held by JPMorgan. It notes that the funds are held
in Illinois, outside of a Colorado probate court's jurisdiction. But the Colorado Court of Appeals
rejected this argument, noting that the only reason the funds were located in Illinois was because
Bernard had deposited them there. *Id.* at 475. That court emphasized that finding otherwise
"would be absurd: it would immunize Bernard's wrongful conduct from the probate court's
oversight through a jurisdictional shield that his own actions created." *Id.* JPMorgan likewise
asserts that the DPC lacks jurisdiction over the POD assets because it allowed Bernard to disclaim
them in 2012 and later declined to void that disclaimer in 2015. But this question has already been
resolved by *Black III*: the DPC has held continuing *in rem* jurisdiction over those assets from the
start. *Id.* at 474–75.

However, this Court's jurisdiction is neither *in rem* nor *quasi in rem*. For one thing, the
United States Supreme Court has held that interpleader actions are *in personam*. *See N.Y. Life Ins.
Co. v. Dunlevy*, 241 U.S. 518, 521 (1916). The First Circuit recently reiterated that holding. *See
Metro. Prop. & Cas. Ins. Co. v. Shan Trac, Inc.*, 324 F.3d 20, 25 (1st Cir. 2003) ("Interpleader
actions are *in personam*, not *in rem*, and cannot resolve the rights of non-parties to anything."
(citation omitted)). And at least one other district court has rejected the argument that the *Princess
Lida* doctrine applies to statutory interpleader actions, observing that "[the] concern for the
stakeholder in an interpleader action is to avoid personal liability for an amount over and above
that of the fund in the stakeholder's possession." *JPMorgan Chase Bank, N.A. v. Neu*, No. 17-

3475, 2017 WL 2290142, at *6 n.8 (D.N.J. May 24, 2017). Although some courts have found that interpleader actions are *in rem*, that authority is not binding on this Court and is less persuasive. *See Gen. Atomic Co. v. Duke Power Co.*, 553 F.2d 53, 57 (10th Cir. 1977) (stating in dicta that statutory interpleader "is an in rem or quasi in rem suit in its nature," but ultimately finding no subject-matter jurisdiction due to failure to meet statutory requirements, not on grounds of prior exclusive jurisdiction); *Cmty. State Bank v. Wilson*, No. 4:18-CV-4078, 2019 WL 4647260, at *3 (W.D. Ark. Sept. 24, 2019) (concluding that statutory interpleader is *in rem* "[i]n the absence of any argument to the contrary"). Dain and Goodwin also cite cases applying the prior exclusive jurisdiction doctrine to interpleader actions under state law, but those cases do not address the application of the doctrine to federal statutory interpleader. *See Roland v. Hickman*, 2:15-CV-1133-JCM-VCF, 2016 WL 1183085 (D. Nev. Mar. 28, 2016); *Brown v. Sperber-Porter*, CV-16-02801-PHX-SRB, 2018 WL 10196506 (D. Ariz. Aug. 2, 2018).

The United States Supreme Court has stated that *Princess Lida* applies to cases "where, to give effect to its jurisdiction, the court must control the property." 305 U.S. at 466. That language seems to apply to statutory interpleader, where there is a statutory, jurisdictional requirement for the plaintiff to deposit the stake with the Court to proceed. If the Court is not given the stake, or a bond for such, the action fails. But this tension is mitigated by the Supreme Court's directive to construe the interpleader statute liberally. *Tashire*, 386 U.S. at 533. Construing statutory interpleader to be *in rem* or *quasi in rem* would frustrate the ability of interpleader plaintiffs to avoid multiple liability and conflicting court orders. It would go against "the very essence of an interpleader action, which requires that a court attack the legal hydra and cauterize each relevant issue." *Howell v. Union Producing Co.*, 392 F.2d 95, 98 (5th Cir. 1968).

Another sign that interpleader actions are *in personam* is that a stakeholders' liability is not necessarily limited to the value of the stake. *See Lee v. W. Coast Life Ins. Co.*, 688 F.3d 1004, 1013 (9th Cir. 2012) (holding that interpleader does not "shield tortfeasors from liability for their negligent mistakes and limit their total financial exposure to the value of the stake"); *Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc.*, 918 F.2d 1065, 1069 (2d Cir. 1990) ("[W]e reject the argument that interpleader jurisdiction is improper where claims against the stakeholder potentially exceed the value of the interpleaded fund."). Thus, liberally construing the interpleader statute, the Court concludes that this is not an *in rem* or *quasi in rem* action for purposes of triggering the prior exclusive jurisdiction doctrine.

### C. Probate Exception

The Court also considers another question regarding its subject-matter jurisdiction that has not been raised by the parties. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (noting that federal courts may raise issues of subject-matter jurisdiction on their own initiative). The probate exception prohibits federal courts from probating a will or administering an estate. *See Markham v. Allen*, 326 U.S. 490, 494 (1946). Here, as discussed further below, the disposition of the Interpleaded Assets is connected to the administration of the conservatorship established by the DPC. The administration of a conservatorship, in turn, is the kind of "peculiarly local function which federal courts are ill equipped to perform." *Hamilton v. Nielsen*, 678 F.2d 709, 710 (7th Cir. 1982). Thus, the Court considers whether the probate exception divests this Court of jurisdiction.

A federal court "may exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the

federal court." *Markham*, 326 U.S. at 494. The Supreme Court has clarified that the probate exception is "essentially a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res,* a second court will not assume *in rem* jurisdiction over the same *res*." *Marshall v. Marshall*, 547 U.S. 293, 311 (2006). There is no conflict where a party seeks an *in personam* judgment, as opposed to "probate or annulment of a will," and where the party does not "seek to reach a *res* in the custody of a state court." *Id.* at 312.

Ultimately, so long as this Court does not take on the probate functions of the DPC—for example, by administering an estate or overseeing a conservatorship—it will not violate the probate exception. In fact, as clarified in *Marshall*, the issue of the probate exception is essentially the same as the prior exclusive jurisdiction issue—it prevents this Court from taking *in rem* jurisdiction where another court has already done so. *Id.* at 311. Thus, this Court's jurisdiction is secure "so long as [it] does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court." *Markham*, 326 U.S. at 494.[9]

## II.     Deposit of Assets and Discharge from Liability

JPMorgan has moved for: (1) an order allowing it to sell the Interpleader Assets and deposit the proceeds with the Court, (2) a discharge from liability regarding the disputed property, and (3) a permanent injunction preventing the claimants from using litigation in other forums to affect the disputed property. (Dkt. No. 79.) The Court addresses the first two requests here, but

---

[9] Another reason not to apply the probate exception is that it is not apparent that the DPC has "custody" of the Interpleaded Funds, which are currently held by JPMorgan on behalf of the Trusts, not by the conservator. *See John Hancock Variable Life, Ins. Co. v. 1st Source Bank*, No. 3:09-CV-430-TS, 2010 WL 1541181, at *4 (N.D. Ind. Apr. 16, 2010) (holding that where asset was not in state court custody and interpleader sought to deposit asset with interpleader court to avoid multiple liability, interpleader jurisdiction was appropriate because any federal judgment "would not purport to dispose of property in the custody of a state probate court").

JPMorgan's request for injunctive relief intersects with other pending motions and will be discussed later in this opinion.

Generally, actions in statutory interpleader proceed in two stages. First, the Court determines whether the jurisdictional requirements have been met. *Exec. Risk Indem. Inc. v. Speltz & Weis, LLC*, No. 09 C 2750, 2009 WL 3380972, at *2 (N.D. Ill. Oct. 16, 2009). If so, discharge is generally granted so long as "the stakeholder legitimately fears multiple litigation over a single fund." *Id.* Second, the Court adjudicates the merits of the claimants' claims to the property. *Aaron*, 550 F.3d at 663. The Court may issue an "order restraining [the claimants] from instituting or prosecuting any proceeding" in a state or federal court affecting the property at issue in the interpleader action. 28 U.S.C. § 2361. And the Court may discharge the plaintiff from further liability, issue a permanent injunction restraining the parties from taking part in other legal actions affecting the property at issue, and "make all appropriate orders to enforce its judgment." *Id.*

JPMorgan seeks a Court order requiring it to sell the marketable securities included in the Interpleaded Assets and to place the proceeds into the Court's registry. Four claimants (Bernard, Samuel, Litvak, and Dal) oppose that request, and three claimants (Dain, Goodwin, and Joanne) express qualified support. The opponents want to keep the assets invested in securities to maximize investment gains while this case is pending and to avoid triggering capital gains taxes for the current tax year.[10] The supporters are willing to accept the risk of missing out on investment gain, but they still think a sale is appropriate only if the tax consequences can be

---

[10] The opponents of selling the assets also contend that the Court lacks the power to order the sale of the assets because that would conflict with existing state-court and arbitration-panel orders. But the Court has the power to enjoin the parties from using any other suit to affect the Interpleaded Assets and to issue all orders necessary to enforce its judgments. *See* 28 U.S.C. § 2361; *Ill. Emps. Ins. of Wausua v. Mihalcik*, 801 F.2d 949, 950–51 (7th Cir. 1986). Thus, the Court may order the sale of the assets even if that order conflicts with existing orders from state courts and arbitration panels.

managed by offsetting capital gains with attorneys' fees. No party contends that it is feasible or desirable for JPMorgan to deposit the actual securities into the Court's registry.

Although there is little caselaw to guide the Court in its decision, the Court concludes that an order requiring a sale of the marketable securities would not be appropriate. JPMorgan has not indicated that it would incur substantial costs by continuing to hold the Interpleaded Assets. In contrast, a forced sale of the securities could create substantial costs for whoever is entitled to the Interpleaded Assets. Reducing the securities to cash now—in the middle of what is already a multiyear suit—could force the assets' owners to miss out on gains in the market. A sale could, of course, have the opposite effect and prevent losses. But the Trusts, which were created to provide for Joanne's needs as a disabled person and for Bernard and his children, are meant to exist for the long term. And there is no effective way to manage the tax consequences if the Court orders a sale now, which also weighs in favor of keeping the assets invested in securities.[11]

In the alternative, JPMorgan asks to post a bond and be released from liability. Here, it is appropriate to discharge JPMorgan from further liability related to the disputed assets it holds. Courts normally discharge a stakeholder after it deposits the property with the Court. *See, e.g.*, *Metro. Life Ins. Co. v. Harris*, 446 F. Supp. 936, 938 (E.D. Wis. 1978). The parties have not identified caselaw in which a district court granted a discharge after requiring a bond in lieu of deposit. But 28 U.S.C. § 2361 gives the Court the authority to "discharge the plaintiff from further liability" without limiting that power to plaintiffs who deposit the disputed assets instead of posting a bond.

---

[11] JPMorgan contends that considering tax and investment consequences of a sale inappropriately adds a requirement to the interpleader statutes. But the Court is not adding any requirements, just considering the equitable implications of forcing a sale of the assets. Moreover, the single case that JPMorgan cites is inapposite. *See Speltz & Weis,* 2009 WL 3380972, at *1 (holding that stakeholder was not required to interplead additional parties who claimed no right to the disputed fund).

Most of the claimants do not oppose a discharge for JPMorgan. The ones who do, Bernard and Samuel, propose that JPMorgan remain a party for the purposes of discovery and for any orders regarding the disposition of the assets. As to the former issue, Bernard and Samuel have not identified any discovery they would seek from JPMorgan that is not available from the other claimants, and Bernard and Samuel could of course seek third-party discovery from JPMorgan. And as to the latter issue, the Court has already conditioned the discharge on JPMorgan's compliance with future orders about the disposition of the disputed assets. Therefore, the Court discharges JPMorgan from further liability for the disputed assets, effective on the date that JPMorgan posts a bond in compliance with the Court's requirements.

Generally, the posting of a bond by JPMorgan should safeguard the claimants' interests, especially because the Court may adjust the bond requirement based on a rise or fall in the value of the Interpleaded Assets. However, the Court qualifies its discharge in two regards. First, JPMorgan must continue to safeguard the Interpleaded Assets and follow this Court's orders regarding their disposition. If JPMorgan mishandles the assets, it may be held liable to the extent that the bond it has posted does not cover the losses. Second, JPMorgan must report on the value of the Interpleaded Assets as directed by the Court and comply with further orders of this Court.

Thus, JPMorgan shall post a bond that is equivalent to the total value of the Interpleaded Assets on the day that this Memorandum Opinion and Order issues. The bond is conditioned on JPMorgan complying with any future order or judgment of the Court with respect to the subject matter of this suit. *See* 28 U.S.C. § 1335(a)(1). JPMorgan must pay the premium on the new bond out of its own assets, but the Court will entertain requests for reimbursement from the Interpleaded Assets at an appropriate stage in these proceedings. If there is a substantial rise or fall

in the value of the assets, the Court will entertain motions from JPMorgan or the claimants to adjust the value of the bond.

### III.    Bernard and Samuel's Motions

Bernard and Samuel previously sought and was granted a rule to show cause why Joanne should not be held in contempt for pursuing a contempt order against Bernard before the DPC. (Dkt. No. 101.) Bernard and Samuel alleged that Joanne violated this Court's order barring parties from enforcing any court order requiring, or otherwise seeking to effectuate, any turnover or withdrawal of the Interpleaded Assets. The Court held show cause proceedings on November 19, 2019 and January 7, 2020, and received supplemental briefs from the parties. Bernard and Samuel filed related motions for injunctive relief, seeking a preliminary injunction directing Goodwin, Dain, and Joanne to (a) discontinue their efforts to have Bernard held in contempt before the DPC, (b) make reasonable efforts to have the DPC's bench warrant for Bernard vacated, and (c) stop all litigation efforts in other forums seeking a turnover of funds from the Interpleaded Assets. (Dkt. Nos. 100, 154.)

Beginning with the rule to show cause, this Court's civil contempt power rests on its inherent authority to enforce compliance with its orders. *See United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001). The Court may hold a contempt proceeding if Bernard and Samuel can show that Joanne violated an order setting forth an unequivocal command. *See id.*

In May 2019, the Court entered an order forbidding JPMorgan from turning over the Interpleaded Assets without the Court's permission. (Dkt. No. 68.) In June 2019, the Court amended the order also to "preclude any party from seeking to enforce any court order requiring, or otherwise seek to effectuate, any turnover or withdrawal of the Interpleaded Assets from the accounts held by Plaintiff, without first filing a motion with this Court." (Dkt. No. 69.) Joanne had

19

been served in this case at that point, but she had not yet appeared. At the time the Court entered those orders, proceedings before the DPC had been ongoing for several years. As discussed above, the DPC had found Bernard liable for civil theft and breach of fiduciary duty and entered an order surcharging him $4.5 million. It also appointed Goodwin as Joanne's new conservator and suspended Bernard as a trustee of the SNT.

On May 10, 2019, Joanne moved for a citation for contempt of court against Bernard before the DPC. (Mot. for Rule to Show Cause, Ex. B, Contempt Mot., Dkt. No. 100.) Joanne contended that Bernard had willfully refused to comply with the Colorado state court's order to remove funds from the Trusts and place them in the DPC's registry. In October 2019, the Colorado state court held a contempt hearing, which Joanne's counsel attended. At that hearing, Joanne's counsel told the state court about this Court's June 2019 order and stated that Joanne did not seek a turnover of any assets from the Trusts. (Resp. in Opp'n to Mot. for Rule to Show Cause, Ex. A, Contempt Citation Tr. at 3:16–20, Dkt. No. 126.) Joanne's counsel stated that her client wanted the state court to hold an evidentiary hearing on Bernard's alleged violations of the DPC's orders. (*Id.* at 7:5–11.) But even though the state court had a preexisting order requiring Bernard to attend all hearings in person, neither Bernard nor his counsel appeared at the contempt hearing. (*Id.* at 2:8–12, 7:12–17.) Therefore, at the request of Joanne's counsel, the Colorado state court issued a bench warrant for both Bernard and his counsel. (Mot. for Rule to Show Cause, Ex. G, Order Issuing Bench Warrant, Dkt. No. 100.)

Based on this record, it was Joanne who moved for a contempt citation in the DPC and asked that court to issue a bench warrant. Dain and Goodwin do not appear to have been involved. Goodwin is Joanne's conservator, but there is no evidence that she directed or was involved in the actions of which Bernard and Samuel complain. The same is true of Dain, who is a trustee of the

SNT but who is not—as far as the record shows—empowered to make litigation decisions for Joanne when she acts in her personal capacity. Because they have not presented evidence of Dain and Goodwin's involvement, Bernard and Samuel have not demonstrated a likelihood of success on the merits against those two persons.

As for Joanne, she filed the motion for contempt in the DPC before she had appeared in this case and before the Court had even entered an order enjoining the parties from pursuing turnover of the Interpleaded Assets. Although Joanne initially sought contempt based on Bernard's failure to turn over the Interpleaded Assets, Joanne's counsel later made clear— repeatedly—that she did not seek any turnover of the Trusts' assets and did not want Bernard held in contempt for failing to turn those assets over to the state court. If Joanne had gone forward on the original basis for her motion, she might have violated this Court's order barring the use of other litigation to force a turnover of the Interpleaded Assets. But Joanne did not go forward on that basis before the state court. Instead, she asked for an evidentiary hearing on various failures by Bernard to follow the DPC's orders. Joanne's actions before the state court therefore did not violate this Court's order because Joanne clearly expressed that she did not want the state court to order Bernard to turn over Interpleaded Assets or to hold him in contempt for failing to do so. Bernard and Samuel therefore have not shown that Joanne violated an express directive from the Court.

Turning to the request for a preliminary injunction, Bernard and Samuel's request focuses on (1) contempt proceedings related to Bernard's failure to appear before the DPC, and (2) litigation efforts in other forums seeking a turnover of the Interpleaded Assets. They must demonstrate that they have "some likelihood of succeeding on the merits," that they have no adequate remedy at law, and that they would suffer irreparable harm without preliminary relief.

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If they can establish those prerequisites, the Court must then balance the harm that they would suffer without an injunction, the harm that Joanne, Dain, and Goodwin would suffer if the injunction were granted, and the public interest (consequences to non-parties). *Id.* at 11–12.

Regarding the contempt proceedings, as discussed above, Bernard and Samuel have not shown that Joanne acted inappropriately before the DPC. The DPC issued a bench warrant because it ordered Bernard to appear before it, and he refused. Bernard had an obligation to follow that order even if he intended to assert a defense. The warrant was justified by Bernard's failure to appear as duly ordered. Bernard and Samuel have not established that they are likely to prevail on this issue and their request for injunctive relief is therefore denied. Their final request for injunctive relief—which would enjoin Joanne, Dain, and Goodwin from pursuing litigation in other forums—is also denied. Because there is substantial overlap between this portion of Bernard and Samuel's motion and JPMorgan's request for injunctive relief, the Court's resolution of this issue is addressed in greater detail below.

## IV. Dal's Motion to Proceed

Having obtained a final judgment against the Trusts, Dal seeks leave to proceed with supplemental proceedings in the Circuit Court of Cook County that would allow her to collect against the Interpleaded Assets. (Dkt. No. 171.) Dal holds an agreed judgment for $348,936.93 against Bernard and Samuel in their capacities as trustees. (Suppl. to Am. Mot. for Leave to Proceed, Ex. A, Agreed Judgment, Dkt. No. 179.) She contends that she is first in line to collect against the Interpleaded Assets because her agreed judgment was entered on October 12, 2017 (before any other judgments) and is now final.

Although Dal contends that her judgment is *res judicata* and not subject to further challenge, that is not the central issue in her motion to proceed. The Court acknowledges that Dal holds a final judgment against the Trusts. Instead, the issue is whether (1) Dal may collect against the Interpleaded Assets, which are under the *in rem* jurisdiction of the DPC, and (2) whether Dal's judgment holds priority over final judgments held by other parties.

The Interpleaded Assets were stolen from Joanne. That is the final order of the DPC, which concluded that Bernard had committed civil theft by disclaiming the POD assets that now make up most or all of the Interpleaded Assets. *Black I*, 422 P.3d at 605–09. Another final order from the Colorado Court of Appeals held that "Bernard's unilateral acts of transferring assets from Joanne's conservatorship to the Trusts do not alter the essential nature of the funds as conservatorship property." *Black III*, 482 P.3d at 477. Indeed, *Black III* established that the POD assets "are not the rightful property of the Trusts." *Id.* at 480. Thus, at this stage it would be inappropriate to allow Dal to collect against the Interpleaded Assets, which consist of the POD assets as transferred to the Trusts by Bernard. *Cf. Schak v. Blom*, 777 N.E.2d 635, 639 (Ill. App. Ct. 2002) (holding that proceedings to enforce a judgment may only properly target the assets of a judgment debtor or a third party holding assets belonging to the judgment debtor); *Belisle v. Plunkett*, 877 F.2d 512, 515 (7th Cir. 1989) (finding that, in the context of bankruptcy proceedings, "[i]f the debtor possesses a stolen diamond ring, the real owner's rights would trump those of a judgment creditor").

There are also competing claims to the assets. First, there is the $4.5 million judgment against Bernard, which may be executable against part or all of the Interpleaded Assets. *Black I*, 422 P.3d 592. The registration of that judgment in Illinois has become final. *Estate of Black v. Black*, 133 N.E.3d 61 (Ill. App. Ct. 2019). There is also the final order stemming from the FINRA

arbitration. On March 23, 2018, a panel of arbitrators ordered JPMorgan to freeze assets in the Trusts for purposes of litigation expenses, paying monetary damages assessed against Bernard, or repaying loans to Bernard, and that this order would remain in effect until (1) the Colorado Courts enter a final order, or (2) the SNT and IT trustees mutually agree in writing to withdrawals. (FINRA Arbitration Award at 6–7.)

Thus, Dal is not the only party to hold an enforceable final judgment. The purpose of a statutory interpleader action is to provide for an equitable proceeding to reach a just outcome where there are overlapping and conflicting claims to a single *res*, and to ultimately "determine rights to a specific fund." *Hebel v. Ebersole*, 543 F.2d 14, 18 (7th Cir. 1976). The Court is not yet in a position to make further determinations regarding rights to the Interpleaded Assets, and Dal identifies no authority allowing her to jump the line. Her motion is denied.

## V.     Injunctive Relief

The Court now returns to JPMorgan's request for a permanent injunction. By statute, the Court has the power to issue a permanent injunction barring the claimants from "instituting or prosecuting any proceeding in any State or United States court affecting" the disputed property. 28 U.S.C. § 2361. Such injunctions are commonplace in interpleader actions. *See, e.g.*, *Exec. Risk Indem.*, 2009 WL 3380972, at *2–3; *Sec. First Network Bank v. C.A.P.S., Inc.*, No. 01 C 342, 2002 WL 485352, at *3 (N.D. Ill. Mar. 29, 2002); *Ill. Emp'rs Ins. of Wausau v. Rapco Foam, Inc.*, No. 83 C 3440, 1985 WL 4906, at *2 (N.D. Ill. Nov. 25, 1985). The Court has already entered an order restraining the claimants from using any other action in state or federal courts to affect the disputed property. (Dkt. No. 69.) This case has involved litigation before numerous state courts, federal district courts, and an arbitration panel. There is a serious risk that a party or parties will, at some point, attempt to use other state or federal courts to affect the disputed property.

That said, interpleader is an equitable action, which means that the Court can consider whether it would be just to stay all other proceedings involving the Interpleaded Assets. One initial concern is whether the Court can appropriately enjoin the parties from proceeding with the DPC action. That *in rem* proceeding involves the administration of a conservatorship in probate, which has been described as a "fight[] over a thing of value that is in the court's control" in which "another court should not try to elbow its way into the fight." *Jones v. Brennan*, 465 F.3d 304, 307 (7th Cir. 2006). Similarly, "state courts are assumed to have developed a proficiency in these matters [and] to have procedures tailored to them;" generally, parties will not be well-served by federal courts administering conservatorships or other *in rem* probate actions. *Id.*; *cf. Union Pac. R.R. Co. v. Bolton*, 840 F. Supp. 421, 428 (E.D. La. 1993) ("[N]othing in the text, language or history of the federal interpleader statute remotely indicates that Congress intended the interpleader statute to be an exception to the rule that federal courts are not equipped to adjudicate things like divorce, support or paternity.").

With these considerations in mind, other circuit and district courts have concluded that a district court may partially abstain from adjudicating claims to an interpleaded fund. *See Am. Airlines, Inc. v. Block*, 905 F.2d 12, 15 (2d Cir. 1990) (concluding on appeal that the district court "should have abstained ***in part*** from adjudicating [interpleader] action" and that it was not appropriate for the court to "immerse itself in domestic relations matters that are properly the province of the state courts"); *NYLife Distribs., Inc. v. Adherence Grp., Inc.*, 72 F.3d 371, 380–81 (3d Cir. 1995) (explaining that because statutory interpleader is an equitable action, federal interpleader courts have discretion to dismiss or stay the case and "defer to state court proceedings for the sake of judicial administration and efficiency"). The Court has authority to prevent the parties from enforcing judgments against the Interpleaded Assets while allowing certain

25

proceedings to continue. In *Tashire*, the Supreme Court allowed for continued litigation in other forums that would lead to judgments against an insured party while authorizing an order "restrain[ing] [the] claimants from seeking to enforce against the insurance company any judgment obtained against its insured, except in the interpleader proceeding itself." 386 U.S. at 535; *see also Buckeye State Mut. Ins. Co. v. Moens*, 944 F. Supp. 2d 678, 701–02 (N.D. Iowa 2013) (entering "piecemeal" restraint on execution of judgments against interpleaded fund but not enjoining state court proceedings affecting fund).

If the Court stayed the DPC proceedings and took up the issue pending there—whether to undo the disclaimer of the POD assets—it would complicate and delay the matter of whether and how Joanne's assets will be returned to her. The DPC has had much to unravel. As noted in *Black III*, "Bernard placed Joanne's diverted conservatorship funds into twenty-five different accounts in the names of one or more of the Trusts, which . . . could only be likened to a shell game." 482 P.3d at 479. Bernard also previously transferred $258,000 from the SNT—for which Joanne is the sole beneficiary—to one of his personal accounts, violating a prior order of the SNT. *Id.* at 484. And after several years and multiple appeals, the DPC is poised to determine whether Bernard's disclaimer of the POD assets—the fraud that initiated countless legal actions across numerous forums—should be undone, and the assets returned to the conservatorship. The DPC is in the best position to trace the disputed assets. For one thing, it has already analyzed Bernard's disposition of the POD assets, supported by a forensic accounting. (Compl., Ex. 11, Attachment A: DPC March 2016 Order, Dkt. No. 1-11.) There is no equitable reason to repeat those proceedings here.

Thus, the Court enters the following injunction. JPMorgan shall not allow any withdrawals of the Interpleaded Assets or execute any instructions with regard thereto without prior approval from this Court. Such approval shall be sought by written motion with due notice provided to all

parties. The parties may continue to litigate the disposition of the POD assets in the DPC

proceedings. Otherwise, no party may seek to effectuate any turnover or withdrawal of the

Interpleaded Assets from the accounts held by Plaintiff, or seek to enforce any court order

requiring such, without first filing a motion with this Court.

This order balances several factors, including the risk of multiple liability faced by

JPMorgan, the DPC's holding that the POD assets belong to the conservatorship and are not

property of the Trusts, the need to efficiently determine the proper disposition of the Interpleaded

Assets, and the goal of concentrating litigation instead of allowing for its continued dispersal

across several forums.

### VI. Motion to Compel

Finally, the Court turns to Bernard and Samuel's motion to compel. (Dkt. No. 134.) With

their motion, Bernard and Samuel contend that Dain and Goodwin wrongfully have withheld

numerous documents under the common-interest doctrine. Bernard and Samuel also object to

Dain and Goodwin's failure to produce a privilege log or confirm whether they have withheld

documents based on privilege.[12]

As a threshold matter, the parties dispute whether the applicable common-interest doctrine

is based in Illinois law, Colorado law, federal common law, or some combination thereof.

Because this action was brought pursuant to the Court's diversity jurisdiction, the Court "applies

the choice-of-law rules of the forum state to determine which state's substantive law applies."

*Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). Illinois

---

[12] Initially, Bernard and Samuel also complained that Dain and Goodwin had not produced any documents from certain email addresses likely to contain responsive materials and that Dain and Goodwin had not produced attorneys' bills. In their response brief, Dain and Goodwin represented that they had made, or would make, appropriate responsive productions, and Bernard and Samuel did not further address the issue in their reply. So the Court concludes that the issue has been resolved.

applies the Restatement (Second) of Conflict of Laws to choice-of-law issues regarding privileged communications. *People v. Allen*, 784 N.E.2d 393, 394 (Ill. App. Ct. 2003). The Restatement provides that communications will be admitted if they are (1) "not privileged under the local law of the state which has the most significant relationship with the communication," or (2) even if it is privileged under the local law of the state with the most significant relationship with the communication, if it is "not privileged under the local law of the forum" and there is no "special reason why the forum policy favoring admission should not be given effect." Restatement (Second) of Conflict of Laws § 139 (1971). Here, Colorado is closer to the center of the disputed communications, as it is the state of the conservatorship and the residence of several parties participating in the disputed communications. Thus, Dain and Goodwin's assertion of the common-interest privilege succeeds only if the communications at issue are privileged under the laws of both Colorado and Illinois; or if disclosure would be permitted under Colorado law but not Illinois law, if there is some special reason why the Illinois law favoring admission should not apply.

In Illinois, the common-interest doctrine requires a common interest on at least one topic between the parties asserting a common interest, although it does not require complete alignment—parties may "harbor materially different views" on other issues even to the extent that "the disagreement results in a subsequent controversy." *Selby v. O'Dea*, 90 N.E.3d 1144, 1161 (Ill. App. Ct. 2017) (internal quotation marks omitted). The privileged communications must "be in furtherance of that common interest." *Id.* at 1162. The doctrine includes communications between the lawyers of the aligned parties, between one party and another party's lawyer, and between one party and another with counsel present. *Id.* at 1163–66. At least "some form of agreement" must exist between the parties to invoke the common-interest privilege. *Ross v. Ill.*

28

*Cent. R.R. Co.*, 129 N.E.3d 641, 653 (Ill. App. Ct. 2019). Of course, to be privileged, communications must also satisfy the usual requirements of attorney-client privilege. *Id.* And the party withholding the communication bears the burden of establishing privilege. *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 432 N.E.2d 250, 257 (Ill. 1982). Meanwhile, under Colorado law, the common-interest doctrine applies to confidential communications that are "intended and reasonably believed to be part of an on-going and joint effort to set up a common legal strategy." *Black v. Sw. Water Conservation Dist.*, 74 P.3d 462, 469 (Colo. App. 2003).

Bernard and Samuel contend that they are trying to obtain thousands of withheld communications that Dain and Goodwin have not demonstrated to be privileged. The universe of those communications is established by a privilege log created by Dain's law firm, Procopio, which was subpoenaed by Bernard and Samuel in this action. That privilege log identifies numerous communications for which a privilege under the common-interest doctrine is claimed. But Dain and Goodwin have not presented facts establishing that the parties to these communications actually operated under a mutual agreement or understanding to maintain confidential communications in furtherance of their common interest. Certainly, under Illinois and Colorado law, it is at least plausible that such a mutual understanding could be established without a written agreement. *See Ross*, 129 N.E.3d at 653 (declining to determine whether a written agreement is required to establish a common-interest defense to waiver of privilege under Illinois law); *Marianist Province of U.S., Inc. v. Century Indem. Co.*, No. 08-CV-01760-WYD-MEH, 2010 WL 3938355, at *2 (D. Colo. Oct. 5, 2010) (oral agreements and "tacit understanding" can establish common-interest defense under Colorado law.) But generally, communications between parties without their attorneys present are not privileged. *See Selby*, 90 N.E.3d at 1165 ("As a general matter, of course, if one party speaks to another party, no attorney-client privilege would

attach—there is no attorney present."). And here, Bernard and Samuel assert, and Dain and Goodwin do not dispute, that numerous communications that were withheld did not involve any of the parties' attorneys. Dain and Goodwin have not explained how such communications could be privileged, and therefore have not met their burden of justifying the withholding of such documents.

Perhaps unsurprisingly, whether privilege applies to these disputed communications has been litigated before—multiple times. In one such action, a court in this District determined that the common-interest doctrine applied to certain communications between Dain and parties connected to Joanne. (Resp. to Mot. to Compel, Ex. B, 17-cv-101 Judge Kennelly Order of Nov. 15, 2018, Dkt. No. 135-2.) That order noted that Dain was not a party to the litigation but often provided input "as an attorney." (*Id.*) But whether Dain gave input "as an attorney" makes no difference unless Dain's input as an attorney was in the context of representing one of the involved parties; attorney-client privilege requires that the attorney be attached to a client. *See People v. Adam*, 280 N.E.2d 205, 207 (Ill. 1972) (noting that privilege requires provision of legal advice to a client "from a professional legal adviser in his capacity as such"). Because Dain and Goodwin have not suggested that Dain represented any other party to the communications, the fact that he may have applied his legal knowledge in these conversations is irrelevant. In short, Dain and Goodwin hold "the burden of showing the facts which give rise to the privilege," and they have not done so here. *Krupp v. Chi. Transit Auth.*, 132 N.E.2d 532, 536 (Ill. 1956).[13]

Also, Dain and Goodwin have not produced a privilege log addressing the responsive documents in their possession, if any, that they have not already produced (beyond those

---

[13] A Magistrate Judge in the Eastern District of New York also concluded that Dain and Goodwin failed to establish that they held a common-interest agreement prior to 2018, although Dain and Goodwin note that they moved for reconsideration of that order. (Bernard & Samuel Mot. to Suppl., Ex. A, E.D.N.Y Order, Dkt. No. 143.)

encompassed by the Procopio log). They offer no explanation for this omission; therefore, they will be ordered to confirm the status of their search for responsive documents and whether they are withholding any additional responsive documents on any basis.

However, the Court is not convinced that all the documents sought by Bernard and Samuel are properly within the scope of discovery. Discovery properly encompasses "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering . . . [among other things] whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). At this stage of the case, the primary issue before the Court is whether the Interpleaded Assets must be returned to the conservatorship and the priority of claims against the Interpleaded Assets, which include Dal's judgment against the Trusts and the conservatorship's judgment against Bernard. The validity of those judgments is not at issue; this Court "must give the same *res judicata* effect to a state court judgment that would be given by courts of that state." *Gen. Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 708 n.11 (7th Cir. 1991). It is not clear what import, if any, the disputed communications have regarding the pertinent matters. Further, the record indicates that a considerable portion of the money Renata left in her estate has been spent in the ever-expanding litigation between the parties to this case. It is unclear that further inquiry into the communications targeted by Bernard and Samuel will produce a likely benefit that is outweighed by the costs and burdens of production. Accordingly, before ordering production of documents based on the motion to compel, the Court will entertain input from the parties regarding the relevance and proportionality of the production.

Thus, Bernard and Samuel's motion to compel is granted in part and denied in part. Dain and Goodwin must confirm whether they have searched their own records for any responsive documents, whether they have completed that search, and whether they are withholding any

documents not encompassed by the Procopio privilege log. The Court concludes that Dain and Goodwin have not sufficiently established that the documents withheld in the Procopio privilege log are protected by attorney-client privilege subject to the common-interest doctrine. However, the Court will not order further production of such documents at this time, as it is not apparent that they are properly within the scope of discovery in this action. Finally, the Court declines to award costs or fees to Bernard and Samuel. When a motion to compel is granted in part and denied in part, as here, the Court has discretion to award expenses. Fed. R. Civ. P. 37(a)(5)(C).

## CONCLUSION

For the reasons given above, JPMorgan's motion for an order regarding interpleader assets, for a permanent injunction, and discharge (Dkt. No. 79) is granted in part and denied in part; Bernard and Samuel's motions for injunctive relief (Dkt. Nos. 100, 154) are denied; Bernard and Samuel's motion to compel production of documents (Dkt. No. 134) is granted in part and denied in part; Dain and Goodwin's motion to dismiss (Dkt. No. 160) is denied; and Dal's motion for leave to proceed (Dkt. Nos. 170, 171) is denied. Pursuant to the Court's rule to show cause (Dkt. No. 107), the Court determines that Joanne did not violate the Court's order, she will not be held in contempt, and the rule is discharged.

ENTERED:

Dated:  September 29, 2021

_____
Andrea R. Wood
United States District Judge